In re PPI ENTERPRISES (U.S.), INC. and Polly Peck Produce, Inc., Debtors.

Bankruptcy Nos. 96–539 (PJW), 96–540(PJW).

United States Bankruptcy Court, D. Delaware.

Dec. 30, 1998.

---

S. David Peress, Young, Conaway, Stargatt & Taylor, Wilmington, DE, for PPI Enterprises (U.S.), Inc.

Laurie Selber Silverstein, William Hazeltine, Potter, Anderson & Corroon, Wilmington, DE, David Boies, Andrew W. Hayes, Boies & Schiller LLP, Armonk, NY, for Sheldon H. Solow d/b/a Solow Building Company.

## MEMORANDUM OPINION

PETER J. WALSH, Chief Judge.

Before the Court are several issues arising out of the claim of Sheldon H. Solow ("Solow") for monies owed as the result of the termination of a lease of real property by the debtor PPI Enterprises, Inc. ("PPI"). Shortly following the commencement of this Chapter 11 case, Solow filed a motion to dismiss the petition as a bad faith filing. That matter was briefed and argued, and the motion was denied without prejudice. After PPI filed its proposed plan, Solow renewed his motion to dismiss the petition as a bad faith filing and also lodged an objection to confirmation of the plan, alleging that the plan is not filed in good faith and does not satisfy several other conditions of § 1129(a).[1] The Court has conducted a number of days of evidentiary hearing on these matters and the hearing is scheduled for completion in February 1999. In the meantime, the parties have advised the Court that they believe the record is complete with respect to a number of issues and have asked the Court to rule on those in advance of completion of the hearing. I will treat the parties' request as being in the nature of motions for partial summary judgment.

Before me are three issues embodied in Solow's motion and objection: (i) whether PPI, in filing its petition for the primary purpose of capping Solow's rent claim pursuant to § 502(b)(6),[2] filed its petition in viola-

---

1. All references to " § ____ " refer to a section of the Bankruptcy Code, 11 U.S.C. § 101 et seq.

2. Section 502(b) reads, in pertinent part:
   [I]f such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim as of the date of the filing of the petition, and shall allow such claim ... in such amount, except to the extent that—...
   (6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—
   (A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the

tion of the good faith filing doctrine or presented its plan in violation of § 1129(a)(3);[3] (ii) if the filing of the petition was proper and if Solow's rent claim is capped pursuant to § 502(b)(6), what is the amount of the rent claim, and (iii) whether a capped rent claim which, pursuant to PPI's plan, is to be paid in full in cash including pre and postpetition interest should be deemed unimpaired. For the reasons discussed below, I find that (i) the petition was not filed in bad faith nor has the plan been proposed in bad faith and (ii) the Solow claim, as capped pursuant to § 502(b)(6) and with the payment of pre and postpetition interest, is not impaired under the plan. Because of what I see as confusion in the written submissions, I am unable to calculate Solow's allowed claim, but I have set forth below several rulings regarding what I find should and should not be included in calculating the claim amount.

## FACTS

On August 9, 1989, Solow and PPI entered into a commercial lease agreement (the "Lease") under which PPI leased from Solow office space in a Manhattan office tower for a period of ten years for use as PPI's corporate headquarters. PPI's indirect parent company, Polly Peck International PLC ("Polly Peck") guaranteed PPI's obligations under the Lease.

On October 25, 1990, the Chancery Division of the English High Court of Justice entered an administration order for Polly Peck and appointed three individuals as administrators for Polly Peck. Solow states that "[s]hortly after their appointment, Polly Peck took control of PPI, ended all of its operations, and directed its liquidation.... [Polly Peck] ordered PPI to breach the Lease and

to abandon the building." (Doc. # 177, Ex. A at 6)

In September 1991, PPI abandoned the premises and stopped paying rent to Solow. On or about October 8, 1991, Solow delivered to PPI written notice of default under the Lease and of PPI's obligation to cure such default within ten days. PPI failed to cure the default, and on October 21, 1991, Solow served a notice terminating the Lease. At that point the unpaid rent for the balance of the term of the Lease was approximately $5.86 million.

On or about October 25, 1991, Solow sued PPI and Polly Peck for breach of the Lease in United States District Court for the Southern District of New York. On November 13, 1992, the District Court granted partial summary judgment in favor of Solow and against PPI on the issue of liability.[4] Solow claims that thereafter Polly Peck "strung Mr. Solow along in settlement discussions" for the next three years while Polly Peck dismantled PPI for Polly Peck's benefit, "act[ing] in a reckless and negligent manner without maximizing PPI's value for all of its creditors." (Doc. # 177, Ex. A at 7)

On April 4, 1996, on the eve of the trial in District Court on the issue of damages, PPI filed its Chapter 11 petition in this Court, thereby staying further collection efforts by Solow and, as Solow claims, "following through on its frequently-made threat" to file bankruptcy. (Doc. # 194 at 3) Solow asserts that PPI did not intend, through its filing, to reorganize, given that PPI "has no ongoing business, only one so-called 'employee,' and no assets other than stock certificates representing a 2% interest in Del Monte Foods Company."[5] (Doc. # 177, Ex. A at 3) In-

remaining term of such lease, following the earlier of—
  (i) the date of the filing of the petition; and
  (ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus
(B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates;

**3.** 1129(a) provides, in pertinent part:
  The court shall confirm a plan only if all of the following requirements are met:

. . .
  (3) The plan has been proposed in good faith and not by any means forbidden by law.

**4.** The District Court dismissed the case against Polly Peck without prejudice because it was under bankruptcy protection in England.

**5.** The Del Monte stock to which Solow refers was initially listed by PPI as having a value of $1,600,000. (Doc. # 100 at 8) However, in an unusual turn of events, in a January 1997 court-approved auction sale the stock was sold by PPI to Solow for $11,000,000. The Court under-

stead, Solow claims that PPI filed its petition with the intent of using § 502(b)(6)'s cap of Solow's rent claim to "create substantial value for [PPI]'s ultimate shareholder—the offshore Polly Peck International PLC and its creditors—at Mr. Solow's expense." (Doc. # 177, Ex. A at 3) To that end, Solow alleges that Polly Peck "orchestrated a series of intercompany sham transactions involving the insolvent PPI, designed solely to benefit [Polly Peck] and to dilute substantially Mr. Solow's claim." (Doc. # 177, Ex. A at 8–9) In response to these transactions, Solow filed a complaint on September 12, 1996 in the United States District Court for the Southern District of New York against the administrators of Polly Peck and Michael Herz, a director of PPI, alleging breach of fiduciary duty and tortious interference with the contractual relations between Solow and PPI.

Of course, PPI takes issue with Solow's allegations. According to PPI, the Del Monte stock was subject to certain transfer restrictions and PPI sought to utilize the bankruptcy in order to facilitate the monetization of the shares and effect an equitable distribution of the proceeds. (Doc. # 100 at 3) PPI states that "[t]his has been a primary goal of the Debtor from the outset." (Doc. # 100 at 9) For purposes of my ruling today, I will assume that the primary purpose of the petition was to cap Solow's claim pursuant to § 502(b)(6).

On August 9, 1996, Solow filed a proof a claim in this Chapter 11 case, asserting damages for breach of the Lease in the amount of $4,757,824.94. PPI has objected to Solow's calculation of his claim. (Doc. # 160) According to PPI, Solow's claim as limited by § 502(b)(6), should only be, at most, $100,-612.07. (Doc. # 196 at 10)

In December, 1996, Solow filed a motion to dismiss PPI's bankruptcy case, alleging that (i) PPI's bankruptcy case was a sham solely to create value for Polly Peck and its credi-

tors at Solow's expense; (ii) PPI's bankruptcy case served no legitimate purpose; and (iii) PPI could never confirm a chapter 11 plan. In January, 1997, the Court denied Solow's motion without prejudice to renew the motion at a later date.

On March 31, 1998, PPI filed a Plan of Liquidation (the "Plan") As to Solow's claim, the Plan treats it as a Class 2 non-insider general unsecured claim which, on the effective date, will be paid with "cash and such other consideration as may be required to leave unaltered the legal, equitable and contractual rights to which such allowed Class 2 Claim entitles the holder thereof." (Doc. # 176 at 16) According to PPI's disclosure statement, the aggregate allowed claims in Class 2 are estimated to be $200,000, including Solow's claim. Presumably, the non-insider non-Solow allowed claims in Class 2 approximate $100,000.[6] Class 3 of the Plan consists of insider (Polly Peck and an affiliate) claims which according to the disclosure statement amount to approximately $54.6 million. Based on statements made in the accompanying disclosure statement and representations made in PPI's briefs, the Court understands that it is PPI's intention to pay Solow, through operation of the Plan, the entire amount of his § 502(b)(6) capped rent claim, plus pre and postpetition interest.[7] Other allowed claims in Class 2 would likewise receive pre and postpetition interest.

On April 6, 1998, Solow filed a renewed motion to dismiss PPI's bankruptcy case (Doc. # 177), relying principally on the same arguments put forth in the earlier motion. On May 11, 1998, Solow filed an objection to confirmation of the Plan, alleging, *inter alia*, that the Plan is being proposed in bad faith in violation of § 1129(a)(3), and that PPI could not obtain an accepting impaired class of claims because Class 2 is improperly deemed unimpaired. (Doc. # 192)

stands that Solow realized a payment of more than $30,000,000 in a subsequent disposition of the stock.

6. According to PPI, there are $260,000 of filed non-affiliated non-Solow claims. (Doc. # 100 at 2)

7. As PPI views it, Solow's claim is entitled to interest from October 1, 1991 to the petition date at New York's statutory rate of 9% and either the same 9% rate or a federal judgment rate from the petition date to the payment date. (Doc. # 197 at 12)

## DISCUSSION

*Did PPI, in Filing its Petition for the Primary Purpose of Capping Solow's Rent Claim Pursuant to § 502(b)(6), File its Petition in Violation of the Good Faith Filing Doctrine or Present Its Plan in Violation of § 1129(a)(3)?*

Solow's renewed motion to dismiss PPI's bankruptcy case alleges that PPI filed its petition in bad faith and, as a result, this Court should dismiss PPI's case. Solow characterizes PPI's bankruptcy case as:

> involv[ing] a struggle between [Solow] and the Administrators [of Polly Peck] in their many guises ... over the right to [PPI]'s remaining asset, the Del Monte stock. Recognizing that Mr. Solow was gaining the upper hand in that struggle, the Administrators retreated to this Court solely to frustrate and delay Mr. Solow's collection efforts. But such a case involving a debtor with no ongoing business, a single asset and only a few real creditors warrants dismissal.

(Doc. # 177, Ex. A at 25)

In a similar vein, Solow has objected to the confirmation of PPI's Plan, alleging that PPI's Plan has been proposed in bad faith, in violation of § 1129(a)(3), which requires a plan proponent to propose a plan "in good faith and not by any means forbidden by law." Both of Solow's bad faith arguments essentially boil down to the issue of whether PPI can file a petition and propose a plan with the primary purpose of *capping* Solow's rent claim under § 502(b)(6).

### *The Good Faith Filing Doctrine*

■ The requirement that debtors file their petition in good faith, often referred to as the "good faith filing doctrine," has a contentious history. Courts which have ruled that good faith is a prerequisite to the filing of a Chapter 11 petition often list several factors for determining whether the debtor filed the petition in bad faith. *See, e.g., Phoenix Piccadilly, Ltd. v. Life Ins. Co. (In re Phoenix Piccadilly, Ltd.),* 849 F.2d 1393, 1394–95 (11th Cir.1988) (listing six factors); *Little Creek Dev. Co. v. Commonwealth Mortgage Co. (In re Little Creek Dev.*

*Co.),* 779 F.2d 1068, 1072–73 (5th Cir.1986) (listing six factors); *In re Grieshop,* 63 B.R. 657, 663 (N.D.Ind.1986) (listing fourteen factors); *In re Victory Constr. Co.,* 9 B.R. 549, 563–64 (Bankr.C.D.Cal.1981) (listing three factors), *vacated on other grounds,* 37 B.R. 222 (9th Cir. BAP 1984) *see also* 7 Collier on Bankruptcy ¶ 1112.07[2] (Lawrence P. King ed., 15th ed.1998) (listing twelve factors that courts have identified as indicia of bad faith). However, the courts have not identified with any consistency which circumstances of the debtor's filing are indicia of bad faith. *See In re Victoria Ltd. Partnership,* 187 B.R. 54, 56–62 (Bankr.D.Mass.1995) (tracing the history of the good faith filing doctrine and noting that courts have focused on such diverse factors as the debtor's honesty, the debtor's prospects for reorganization, and the debtor's abuse of the judicial process, with little consistency amongst the decisions); *see also* Lawrence Ponoroff & F. Stephen Knippenberg, The Implied Good Faith Filing Requirement, 85 Nw.U.L.Rev. 919, 944 (1991) ("[T]he standards by which good faith is to be judged remain ill-defined and obscure."). Other courts have been loathe to apply a rigid list of factors, *see In re Clinton Centrifuge, Inc.,* 72 B.R. 900, 905 (Bankr. E.D.Pa.1987) (stating that "the application of the good faith doctrine to a particular chapter 11 filing cannot be based upon a rigid utilization of specific factors"), or have rejected the good faith filing doctrine altogether, *see Victoria Ltd. Partnership,* 187 B.R. at 62 (rejecting the good faith filing doctrine as "an amorphous gestalt, devoid of reasoning and impenetrable to understanding"); *cf. In re 1606 New Hampshire Ave. Assocs.,* 85 B.R. 298, 308 (Bankr.E.D.Pa.1988) (doubting the existence of the good faith filing doctrine in Chapter 11). It is through this conflicting maze of case law that this Court must traverse in order to decide whether a debtor's petition filed for the principal purpose of capping a rent claim pursuant to § 502(b)(6) is a bad faith filing.

In enacting the Bankruptcy Code, Congress made a determination that an eligible debtor should have the opportunity to avail itself of a number of Code provisions which adversely alter creditors' contractual and

nonbankruptcy law rights. *See In re Johns–Manville Corp.*, 36 B.R. 727, 735–37 (Bankr. S.D.N.Y.1984) (discussing Congress's intent to provide debtors with open access to chapter 11 filing). For example, in addition to § 502(b)(6), the following Code provisions clearly alter such creditor rights: § 502(b)(2) (disallowing claims for unmatured interest); § 502(b)(7) (limiting the damages recoverable by an employee for a breach of the employee's employment contract to one year's compensation); § 502(b)(8) (disallowing claims resulting from a reduction, due to late payment, in the amount of an otherwise applicable employment tax credit available to the debtor); § 510(b) (subordinating claims of shareholders arising from securities law violations, often reducing the claim to having little or no value); § 365(f) (allowing a debtor to effect a lease assignment to a lessee not of lessor's choosing and/or on terms not reflecting current market conditions); § 1129(a)(9)(C) (allowing debtors to pay governmental tax claims over a period of six years).

■ In *Clinton Centrifuge*, the court cautioned against having a good faith mantra overriding Congress's design embodied in the Code:

> In engrafting the good faith requirement into the Code, courts must be careful not to upset the delicate balance of interests fashioned by Congress under chapter 11. Moreover, to the extent that the concept of good faith exists independent of other Code provisions (such as adequate protection), courts must be vigilant to apply this concept in ways consistent with the legislative policy decisions embodied in these other statutory enactments. Thus, in evaluating a debtor's good faith, the court's only inquiry is to determine whether the debtor seeks to abuse the bankruptcy law by employing it for a purpose for which it was not intended.

*Clinton Centrifuge*, 72 B.R. at 905. As other courts have noted, it is not "bad faith" for debtors to file for bankruptcy in order to take advantage of a particular provision of the Code. *See In re W & L Assocs., Inc.*, 71 B.R. 962, 967–68 (Bankr.E.D.Pa.1987) (rejecting the argument that it was "bad faith" to file a petition solely for the purpose of using § 365 of the Bankruptcy Code); *In re Bofill*, 25 B.R. 550, 552 (Bankr.S.D.N.Y.1982) (permitting rejection of contract even though rejection was sole purpose of bankruptcy filing); *cf. In re TLCS, Inc.*, 1990 WL 52053, *2 (Bankr.E.D.Pa. April 20, 1990) (holding that it is not "bad faith" to obtain a breathing space from litigation in other forums). Because PPI's intention to cap Solow's claim using § 502(b)(6) is not a use of the Code "for a purpose for which it was not intended"—indeed, PPI is using § 502(b)(6) for exactly its intended purpose—I find that PPI's filing does not violate the good faith filing doctrine.[8]

■ Implicit in Solow's position is the premise that Chapter 11 petitions should be limited to those situations in which a reorganization is being sought. Not so. The Code clearly contemplates liquidating plans. *See* § 1123(b)(4). Indeed, the Code does not even use the term "reorganization."

■ Given the very small amount of non-insider claims, other than Solow's, Solow argues that the petition should not be allowed because the application of § 502(b)(6) is unfair to him. According to Solow, this is particularly so if he is successful in challenging the legitimacy of Polly Peck's insider creditor claims by having the insider creditor claims recharacterized as equity interests. Thus, if Solow's claim is capped and if all, or a substantial portion, of the insider creditor claims are reclassified as equity, Solow argues that because PPI presently has in excess of $11 million available for distribution under its liquidating Plan, he is being unfairly treated. However, in enacting the Code, Congress has already made certain determinations of what is "fair" by mandating what procedural and substantive curtailments of

---

8. In arguing for a dismissal of the case, Solow also alleges certain pre and postpetition misconduct by PPI and Polly Peck. Those issues are not ripe for decision at this time because the evidentiary hearing has not been concluded. However, it does seem to me that these allegations go more to the question of whether a trustee should be appointed in this case rather than whether the case should be dismissed as a bad faith filing.

rights, including the application of § 502(b)(6), will apply to creditors and other parties in interest. There is no suggestion in the Code that the application of § 502(b)(6), or any other provision which curtails creditor rights, is limited by a consideration of the circumstances of a particular chapter case. In adopting § 502(b)(6), Congress made the determination of what is "fair" to lessor creditors vis-a-vis the other parties in interest in a bankruptcy case. This Court is not at liberty to make the kind of equitable adjustment that Solow insists his situation warrants. I am bound by the plain language of the Code. *See United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). As the court observed in *In re Federated Dep't Stores, Inc.,* 131 B.R. 808, 817 (S.D.Ohio1991):

> There is simply nothing in the plain language of section 502(b)(6) to suggest that a bankruptcy court may depart from the application of the cap on a lessor's claim any time the debtor is solvent or the court otherwise believes the equities of the case might warrant such a departure.

*See also United States v. Noland,* 517 U.S. 535, 540–41, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996) (finding that congressionally-created distribution priorities cannot be categorically altered for equitable reasons); *In re Fesco Plastics Corp.,* 996 F.2d 152, 157 (7th Cir. 1993) ("[A] bankruptcy court is simply not authorized to do whatever is necessary to reach an equitable result; it may only do whatever is necessary to enforce the Code....").

Solow takes his position to its logical conclusion by asserting that "Section 502(b)(6) of the Bankruptcy Code should not apply in a solvent debtor case." (Doc. # 194 at 5) The Code allows for no such distinction between value for creditors involving the application of § 502(b)(6) and value for equity holders excluding the application of § 502(b)(6). Section 1123(b)(4) allows a plan to "provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims *or interest.*" § 1123(b)(4) (emphasis added). Section 1123(b)(4) contains no suggestion that those portions of the Code which

alter creditors' nonbankruptcy law rights must first be excised before any value can be distributed to interest holders. In large Chapter 11 cases, it is possible to have numerous leases rejected, the resulting claims capped pursuant to § 502(b)(6), and value retained by interest holders. Thus, Congress clearly contemplated value being given to equity holders even where creditors' nonbankruptcy law rights are materially adversely affected by the Code.

Solow cites several cases for the proposition that "a case involving a debtor with no ongoing business, a single asset and only a few real creditors warrants dismissal." (Doc. # 177, Ex. A at 25) (citing *Carolin Corp. v. Miller,* 886 F.2d 693 (4th Cir.1989); *Phoenix Piccadilly, Ltd. v. Life Ins. Co. (In re Phoenix Piccadilly, Ltd.),* 849 F.2d 1393 (11th Cir.1988)). These cases are distinguishable from the case at bar. In *Carolin,* the court held that although single-asset debtors are generally proper subjects for Chapter 11 relief, *id.* at 705, the debtor was part of a dummy corporate structure constructed on the eve of filing in order to isolate its asset from a secured creditor, and that such conduct by the debtor indicated that it had filed "for abusive rather than permissive purposes", *id.* at 704. The *Phoenix Piccadilly* case also involved a single-asset real estate debtor who filed in order to stave off foreclosure. Many of the factors that the *Phoenix Piccadilly* court cited as evidence of bad faith involved attempts by a debtor holding a single asset to frustrate a secured creditor's collection attempts. *See Phoenix Piccadilly,* 849 F.2d at 1394–95. Because the *Carolin* and *Phoenix Piccadilly* courts were addressing the issue of bad faith filings in a two-party dispute between a debtor with a single asset and a secured creditor holding a security interest in that asset, the facts of those cases are distinguished from the relationship between PPI and Solow, who holds an unsecured claim for lease termination damages. To the extent that the factors mentioned in *Carolin* and *Phoenix Piccadilly* apply to the case at bar, I find that because PPI filed its petition to utilize a provision of the Code specifically designed by Congress to materially limit the rights of landlord creditors, this

filing purpose overrides any of the factors in the cases that Solow cites.

Furthermore, it is important to note that § 502(b)(6) is not tethered to Chapter 11 cases. It applies equally to Chapter 7 cases. Certainly, no one could argue that nonlandlord creditors of a failing entity should not be permitted to file an involuntary Chapter 7 petition which would have the effect of limiting a landlord creditor's claim by reason of § 502(b)(6) to achieve the bankruptcy law distribution scheme devised by Congress. In designing this distribution scheme, Congress was obviously cognizant of the race to the courthouse and the collection pursuit which exists outside the bankruptcy arena—the type of activity not unlike that which Solow pursued prior to the petition filing. The Code, including such provisions as § 502(b)(6), reflects Congress's scheme for leveling the playing field.

In support of his position, Solow points to *Mother African Union Methodist Church v. Conference of Aufcmp Church (In re Conference of African Union First Colored Methodist Protestant Church)*, 184 B.R. 207 (Bankr. D.Del.1995), a case in which I dismissed a Chapter 11 petition as a bad faith filing. However, the circumstances of that decision differ markedly from the case at bar. The *Aufcmp* case was a filing by the debtor solely to circumvent and frustrate legitimate state court proceedings. The debtor in *Aufcmp* was not simply availing itself of a Code provision that alters a nonbankruptcy law result, but instead was filing in order to convince a state court of a factual contention being made by the debtor in that court and to establish other factual propositions which could not be properly established by such filing. In the case at bar, Solow has not claimed, nor does any evidence exist to show, that PPI filed its petition solely in order to delay an ongoing nonbankruptcy court proceeding or to establish a factual contention in such proceeding. Instead, Solow is claiming that PPI has filed to avail itself of the protection of the Code, specifically § 502(b)(6)'s cap on Solow's rent claim, which provision Congress enacted with the intent of limiting the relief that a lessor could otherwise obtain in a nonbankruptcy court.

*The Good Faith Requirement of § 1129(a)(3)*

Unlike the somewhat nebulous good faith filing doctrine, § 1129(a)(3) is a specific predicate which requires that a plan be "proposed in good faith and not by any means forbidden by law." Section 1129(a)(3)'s good faith test is more narrowly focused than the good faith filing doctrine, testing only "whether the debtor's conduct in formulating, proposing, and confirming *a plan* displays the requisite honesty of intention." 7 Collier on Bankruptcy ¶ 1112.07[6][b]. In narrowing this focus, courts do not consider the debtor's motives for filing their petition when determining whether the plan fulfills the good faith requirement of § 1129(a)(3). *See Bank of America v. 203 North LaSalle St. Partnership*, 195 B.R. 692, 701–02 (N.D.Ill.1996), *aff'd*, 126 F.3d 955 (7th Cir.1997).

Although the term "good faith" is not further defined in the Code, in the context of a Chapter 11 plan, courts have held a plan is to be considered in good faith "if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code." *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr.S.D.N.Y.1984). As discussed above, the Code intends to permit debtors to cap the claims of a landlord pursuant to § 502(b)(6). Thus, the fact that a debtor proposes a plan in which it avails itself of an applicable Code provision does not constitute evidence of bad faith. *Cf. Hanson v. First Bank*, 828 F.2d 1310, 1315 (8th Cir.1987) (holding that because the Code permits parties to file a liquidating Chapter 11 plan, the fact that a party filed such a plan should not be evidence of bad faith under Section 1129(a)(3)).

*What is the Proper Amount of Solow's Rent Claim, As Limited by § 502(b)(6)?*

*Section 502(b)(6) Applies to Solow's Rent Claim*

Before discussing the proper amount of Solow's rent claim, as capped by § 502(b)(6), I must first address Solow's argument that his claim should not be limited by 502(b)(6) because PPI proposes to pay all

noninsider claims in full and there is no reason for a solvent PPI not to treat Solow's claim similarly. Solow cites the case of *In re Danrik, Ltd.*, 92 B.R. 964 (Bankr.N.D.Ga. 1988), for the proposition that "the limitation of Section 502(b)(6) should not apply [when] the debtor was solvent and the landlord's claim [is] not proportionately large in relation to the damage suffered." (Doc. # 194 at 5)

The *Danrik* case is easily distinguished from the case at bar. The landlord's claim in *Danrik* arose against a debtor-guarantor of a lease and not against a lessee. *Id.* at 965. The *Danrik* court noted that § 502(b)(6) did not expressly include or exclude from its application the claim of a lessor against a debtor-guarantor, and therefore the court chose to examine the equities of the case after deciding that § 502(b)(6) did not "literally" apply to a guarantor's claim. *Id.* at 967.

In contrast, the case at bar involves a lessee, not a guarantor of the lease. Therefore, the plain language of § 502(b)(6) mandates that the cap applies. *See Federated Dep't Stores*, 131 B.R. at 817; *In re Episode USA, Inc.*, 202 B.R. 691, 693–96 (Bankr. S.D.N.Y.1996) (rejecting the distinction between lessee and guarantor); *In re Interco Inc.*, 149 B.R. 934, 940–41 (Bankr.E.D.Mo. 1993) (same). Because the case at bar deals with a lessee and not a guarantor, no departure from § 502(b)(6) is warranted and Solow's rent claim will be subject to its cap.

*The Proper Measure of "Rent Reserved" under § 502(b)(6)*

The parties are clear about which charges under the Lease they dispute as being allowed under 502(b)(6)'s definition of "rent reserved." The briefs, however, are much less clear about the dollar amount that would be due under the Lease were a particular charge to be allowed under § 502(b)(6). For this reason, I will address the issue of which charges are properly allowed under § 502(b)(6)'s definition of "rent reserved," but will forego discussion of the proper dollar amount of those charges to be allowed. Based on my rulings here, the parties can

revisit the numbers and, absent an agreement, I will determine the claim amount based on further submissions by the parties.[9]

*Attorneys' Fees*

In Solow's response to PPI's objection, he claims that he is entitled to attorneys' fees because § 502(b)(6) only addresses the calculation of a landlord's rent claim. Solow cites *Cutler v. Lindsey (In re Lindsey)*, 199 B.R. 580, 586 (E.D.Va.1996), for the proposition that "additional amounts over and above rent" are separate claims not included in § 502(b)(6)'s calculation. (Doc. # 194 at 10–11) Solow's demand for attorneys' fees raises two distinct questions: (i) whether attorneys' fees may be awarded independent of the § 502(b)(6) cap for damages resulting from lease termination; and (ii) if those fees may not be awarded independent of the § 502(b)(6) cap, are they allowed under § 502(b)(6)'s definition of "rent reserved."

Solow's contention that attorneys' fees incurred in relation to PPI's default under the Lease are separate claims not included in the § 502(b)(6) calculation is refuted by the language of the Lease itself and applicable case law. Under the Lease, "additional rent" is defined to mean "all sums of money, other than fixed rent, as shall become due and payable from Tenant to Landlord hereunder." (Doc. # 160, Ex. A at art. 34.B(2)) Article 19 of the Lease provides that any attorneys' fees incurred by Solow in connection with a default by PPI "shall be deemed to be additional rent hereunder." (Doc. # 160, Ex. A at art. 19) Thus, the Lease designates attorneys' fees as rent. In addition, courts have held that the § 502(b)(6) cap "represents that maximum amount recoverable as a result of the termination of the lease, thereby precluding the payment of attorneys' fees as additional damages." *In re Blatstein*, 1997 WL 560119, *16 (E.D.Pa. Aug. 26, 1997); *see also Kuske v. McSheridan (In re McSheridan)*, 184 B.R. 91, 102 (9th Cir. BAP 1995) (holding that "all damages due to nonperformance [under the lease] are encompassed by [502(b)(6) ]").

9. As noted above, PPI asserts that, at most, Solow's claim should be allowed in the amount of $100,612.07. Solow asserts that if the § 502(b)(6) cap is applicable, his allowed claim would still be $863,937.67.

Solow cites *Lindsey* for the proposition that a landlord is entitled to assert claims for attorneys' fees because they were not contemplated by § 502(b)(6)'s rent cap. However, the court in *Lindsey* stated that its holding turned on the fact that "the lease at issue clearly states that the recovery of attorneys' fees is not a 'payment specifically denominated as rent.'" *Lindsey*, 199 B.R. at 586. In contrast, the Lease specifically denominates Solow's attorneys' fees as "additional rent." Thus, the lease in *Lindsey* materially differs from the Lease in the case at bar and, because the Lease between Solow and PPI designates attorneys' fees as an item of damages resulting from termination of the Lease, those attorneys' fees fall within the ambit of § 502(b)(6). *See Blatstein*, 1997 WL 560119, *16 (distinguishing *Lindsey* and holding that, where the lease at issue included attorneys' fees as an item of damages occurring as a result of lease termination, those fees were properly calculable under § 502(b)(6)).

■■■ Because the attorneys' fees in the Lease were specifically denominated as rent, and thus are not considered independent of the § 502(b)(6) cap, it must be determined whether such fees should be allowed under § 502(b)(6)'s definition of "rent reserved." Courts have applied a three-part test, known as the *McSheridan* test, to determine if charges arising from a lease constitute "rent reserved" under § 502(b)(6). *See McSheridan*, 184 B.R. at 99–100; *Blatstein*, 1997 WL 560119, *16; *Fifth Ave. Jewelers, Inc. v. Great E. Mall, Inc. (In re Fifth Ave. Jewelers, Inc.)*, 203 B.R. 372, 381 & n. 11 (Bankr. W.D.Pa.1996); *In re Pacific Arts Publishing, Inc.*, 198 B.R. 319, 323–24 (Bankr.C.D.Cal. 1996); *cf. First Bank Nat'l Ass'n v. FDIC*, 79 F.3d 362, 369 n. 7 (3d Cir.1996) (noting the factors of the *McSheridan* test in applying FIRREA cap to a rent claim). In *McSheridan*, the bankruptcy appellate panel adopted a three-part test that must be met for a lease charge to constitute "rent reserved" under § 502(b)(6):

1) The charge must: (a) be designated as 'rent' or 'additional rent' in the lease; or (b) be provided as the tenant's/lessee's obligation in the lease;

2) The charge must be related to the value of the property or the lease thereon; and

3) [T]he charge must be properly classifiable as rent because it is a fixed, regular or periodic charge.

*McSheridan*, 184 B.R. at 99–100.

■■■ Because attorneys' fees are neither related to the leasehold's value nor constitute a fixed, regular, or periodic charge, courts applying the *McSheridan* test to the question of whether attorneys' fees are allowable as "rent reserved" under Section 502(b)(6) have held that such fees are not allowable. *See Pacific Arts*, 198 B.R. at 324 (holding that attorneys' fees do not relate to the value of the property nor are they a fixed, regular, or periodic charge); *see also Blatstein*, 1997 WL 560119, *16 (refusing to award attorneys' fees under the Section 502(b)(6) cap); *In re Storage Technology Corp.*, 77 B.R. 824, 825 (Bankr.D.Colo.1986) (holding attorneys' fees noncompensable under Section 502(b)(6) because they "don't relate to the value or use of the property"). No provisions exist in the Lease that distinguish it from the above-cited cases. The attorneys' fees allowed for under the Lease do not relate to the value of the property, nor are the attorneys' fees fixed, regular, or periodic under the Lease. Such fees relate only to the expense incurred by Solow in pursuing remedies against PPI and they arose only as a result of PPI's default. Thus, Solow's attorneys' fees fail prongs two and three of the *McSheridan* test and are not properly allowable as "rent reserved" under § 502(b)(6).

*Late Fees*

■■■ Solow's proof of claim includes charges for "late fees," payable under Article 34.C(9) of the Lease, at a rate of six cents per dollar on any amounts not paid when due. According to Stephen Cherniak, chief executive officer of Solow Building Company, the purpose of the late fee is to "give the tenant the incentive to pay the rent on time. . . . It is a late payment penalty, not interest, for carrying the balance due from the tenant." (Doc. # 196, Ex. C at 82–3) Similar to the attorneys' fees discussed above, in order to be properly included as

"rent reserved," the Lease's late fees must satisfy the three-prong *McSheridan* test.

The Lease's late fees arise only as a result of PPI's breach of the lease and are not regular, fixed, or periodic charges. *See Fifth Avenue*, 203 B.R. at 381 ("[L]iquidated damages are clearly not regular or periodic, and they also cannot be fixed because they are only recoverable in the event of a contractual default . . . ."). Nor do the late fees relate to the value of the leasehold. Instead, as Cherniak indicates, they are intended as an incentive to the lessee for making timely payment. Thus, because the Lease's late fees fail the second and third prongs of the *McSheridan* test, they are not properly included as rent reserved under § 502(b)(6).

*Application of the Security Deposit to Solow's § 502(b)(6) Claim*

██ In its objection to Solow's proof of claim, PPI states that Solow's claim should be offset by his draw on a $650,000 standby letter of credit that PPI claims Solow received as a security deposit, and which he drew down subsequent to his termination of the Lease in October of 1991. (Doc. # 160 at 1-2, 4) In response, Solow states that the letter of credit was not a security deposit that constituted estate property because he drew on the security deposit prior to PPI's filing, and thus it should not be applied to reduce his § 502(b)(6) claim. (Doc. # 194 at 11-12)

The legislative history and case law pertaining to the treatment of security deposits under § 502(b)(6) makes clear that any security deposit held by a landlord at the time of termination of the lease of real property will be applied in satisfaction of the claim allowed under § 502(b)(6). The legislative history of § 502(b)(6) states that the landlord "will not be permitted to offset his actual damages against his security deposit and then claim for the balance under [§ 502(b)(6) ]. Rather, his security deposit will be applied in satisfaction of the claim that is allowed under [§ 502(b)(6) ]" H.R.Rep. No. 595, at 353-54 (1977); S.Rep. No. 989, at 63-64 (1978).

Moreover, cases have uniformly held that security deposits held by the landlord or applied by the landlord after the termination of the lease will be deducted from that landlord's § 502(b)(6) claim. *See, e.g., In re Handy Andy Home Improvement Centers, Inc.*, 222 B.R. 571, 574-75 (Bankr.N.D.Ill. 1998); *Blatstein*, 1997 WL 560119, *16-17; *In re Atlantic Container Corp.*, 133 B.R. 980, 989 (Bankr.N.D.Ill.1991).

Solow attempts in his brief to distinguish at least one of these cases, *Atlantic Container*, by pointing out that *Atlantic Container* dealt with a landlord who still held the tenant's security deposit, while Solow applied the security deposit over six years ago. (Doc. # 194 at 12-13) In *Atlantic Container*, the lessor held the security deposit at the time of filing because the lease was still in effect up to that time. Because PPI surrendered the premises prior to the filing, Solow rightly applied the security deposit subsequent to PPI's surrender and prior to filing. Solow claims that this difference in timing distinguishes the two cases. However, these differences in timing are irrelevant because § 502(b)(6)'s cap on a landlord's claim takes effect at the earlier of (i) the date of filing and (ii) the date on which lessee surrenders or lessor repossesses the property. Thus, so long as the landlord applied the security deposit at a time subsequent to either (i) or (ii) above, § 502(b)(6) will require that security deposit to be subtracted from the landlord's § 502(b)(6) claim. In this case, because Solow drew down the letter of credit for $650,000 subsequent to termination of the lease, Solow's § 502(b)(6) claim should be reduced by that amount.

*Is a Capped Rent Claim which, Pursuant to PPI's Plan, is to be Paid in Full in Cash Plus Postpetition Interest Deemed Unimpaired?*

██ Solow objects to confirmation of the Plan on the ground that, *inter alia*, Class 2 is not properly deemed an accepting class of claims because his claim is impaired and entitled to vote. Solow reaches this conclusion by arguing that Congress's 1994 amendment deleting § 1124(3) of the Code eliminated unimpairment for creditors receiving cash equal to the creditor's allowed claim plus

postpetition interest.[10] Solow also argues that he must receive cash payment for the full amount of his uncapped claim of $4.7 million, because § 1124(1) requires a debtor to leave a creditor's "claim," not their "allowed claim," unaltered in order for that claim to be treated as unimpaired.[11]

### The Effect of the 1994 Amendment to § 1124(3)

Solow argues that Congress, through its 1994 amendment deleting § 1124(3), intended to establish voting rights for all creditors who receive a 100% cash-out with interest under a debtor's plan. An examination of the legislative history and subsequent commentary suggest to me that Congress intended the amendment to have a narrower purpose.

The legislative history advises that the 1994 amendment "relate[d] to the award of postpetition interest" to unsecured creditors where the debtor was solvent, and specifically addressed the *In re New Valley Corp.*, 168 B.R. 73 (Bankr.D.N.J.1994), decision. H.R.Rep. No. 835, at 25–26 (1994). In *New Valley*, the New Jersey bankruptcy court held that the language of § 1124(3) allowed a debtor who was liquidation and reorganization solvent to pay the allowed claims of an "unimpaired" unsecured creditor in full without having to pay the postpetition interest which that claim accrued. The result in *New Valley* stood in contrast with a line of cases [12] holding that where a debtor is solvent, unsecured creditors must be paid in full, including

postpetition interest, pursuant to the "fair and equitable" test of § 1129(b)(2) when the debtor is cramming down that creditor's claim. Thus, solvent debtors could avoid paying "unimpaired" unsecured creditors postpetition interest by paying them in full in cash, yet the same solvent debtor would be required to pay postpetition interest to an "impaired" dissenting class of unsecured creditors. In response to *New Valley*, Congress deleted § 1124(3). The legislative history to that deletion states that

> [t]he principal change in this section … relates to the award of postpetition interest. In a recent Bankruptcy Court decision in *In re New Valley Corp.*, 168 B.R. 73 (Bankr.D.N.J.1994), unsecured creditors were denied the right to receive postpetition interest on their allowed claims even though the debtor was liquidation and reorganization solvent. The New Valley decision applied section 1124(3) of the Bankruptcy Code literally by asserting, in a decision granting a declaratory judgment, that a class that is paid the allowed amount of its claims in cash on the effective date of a plan is unimpaired under section 1124(3), therefore is not entitled to vote, and is not entitled to receive postpetition interest. The Court left open whether the good faith plan proposal requirement of section 1129(a)(3) would require the payment of or provision for postpetition interest. In order to preclude this unfair result in the future, the Committee finds it appropriate

**10.** Prior to the 1994 amendment, § 1124 read:

> Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan—
> . . .
> (3) provides that, on the effective date of the plan, the holder of such claim or interest receives, on account of such claim or interest, cash equal to—
> (A) with respect to a claim, the allowed amount of such claim; or
> (B) with respect to an interest, if applicable, the greater of—
> (i) any fixed liquidation preference to which the terms of any security representing such interest entitle the holder of such interest; or

> (ii) any fixed price at which the debtor, under the terms of such security, may redeem such security from such holder.

**11.** Section 1124 currently reads:
> Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan—
> (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest;

**12.** The legislative history refers to *Consolidated Rock Prods. Co. v. Du Bois*, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982 (1941); *Debentureholders Protective Comm. Of Continental Inv. Corp. v. Continental Inv. Corp.*, 679 F.2d 264 (1st Cir. 1982) and cases cited therein.

to delete section 1124(3) from the Bankruptcy Code.

As a result of this change, if a plan proposed to pay a class of claims in cash in the full allowed amount of the claims, the class would be impaired, entitling creditors to vote for or against the plan of reorganization. If creditors vote for the plan of reorganization, it can be confirmed over the vote of dissenting class of creditors only if it complies with the "fair and equitable" test under section 1129(b)(2) of the Bankruptcy Code and it can be confirmed over the vote of dissenting individual creditors only if it complies with the "best interests of creditors" test under section 1129(a)(7) of the Bankruptcy Code.

The words "fair and equitable" are terms of art that have a well established meaning under the case law of the Bankruptcy Act as well as under the Bankruptcy Code. Specifically, courts have held that where an estate is solvent, in order for a plan to be fair and equitable, unsecured and undersecured creditors' claims must be paid in full, including postpetition interest, before equity holders may participate in any recovery.

H.R.Rep. No. 835, § 214 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3340.

Solow cites select portions of the legislative history in arguing that Congress intended the deletion of § 1124(3) to give voting rights to all creditors—even those receiving payment in full with interest. However, my reading of the legislative history indicates that Congress merely intended to eliminate the anomalous result created by the *New Valley* decision. *See In re Rocha*, 179 B.R. 305, 307 n. 1 (Bankr.M.D.Fla.1995) ("[A] solvent debtor must now pay post-petition and pre-confirmation interest on a claim to have a class considered 'unimpaired.' Section 1124(3) has been deleted in its entirety, which had previously allowed a class of creditors to be considered 'unimpaired' without paying interest on the claim."); Marvin E. Jacob et al., An Analysis of the Provisions of the Bankruptcy Reform Act of 1994 Relating

to Cases Administered under Chapter 11, 4 J.Bankr.L.Prac. 339, 369 (1995) ("[T]he deletion of Bankruptcy Code Section 1124(3) requires that creditors of a solvent estate be paid in full, with interest, before equity holders may participate in any recovery."). Thus, I conclude that Congress did not intend to eliminate unimpairment for purely money claims. It intended that to be unimpaired, the claim must receive postpetition interest.

This result puts the creditor in the same position it would be in if no bankruptcy occurred and a fully solvent debtor satisfied the obligation by cash payment in full with interest to the date of payment. The creditor could demand no more outside of bankruptcy; why should it be entitled to more in bankruptcy? Indeed, it strikes me as anomalous to suggest that a creditor should be able to vote on whether to accept *all* that it is entitled to by contract and law.[13]

In support of his position that Congress in deleting subsection (3) intended to eliminate unimpairment by cash-out, Solow argues that "Congress did not enact in 1978 *two* sections [i.e., § 1124(1) and (3) ] of the *same* statute to reach the *same* result—nonimpairment through leaving a creditor's legal, contractual and equitable rights unaltered.... That is, if 1124(1) always subsumed 1124(3), then the later provision never served a purpose." (Doc. # 192 at 9–10) I do not read § 1124(1) as subsuming § 1124(3). Section 1124(3) applied a different test for nonimpairment than does § 1124(3). Section 1124(3) created nonimpairment status by a cash payment equal to the allowed amount of the claim but without postpetition interest. Such treatment could not qualify for nonimpairment under § 1124(1) because the failure to pay postpetition interest does not leave unaltered the contractual or legal rights of the claim. If, in a nonbankruptcy context, the creditor would be entitled to interest on its claim to the date of payment, then in a bankruptcy context the claim is altered absent the interest payment. Section 1124(3) may be viewed as an exception to the test set forth in § 1124(1). Con-

---

**13.** Of course, there may be disputes regarding the proper rate of interest and its calculation. However, the courts can easily resolve these just as they do with respect to disputed interest rates in cram downs of secured claims.

gress, of course, deleted the section for the reason discussed above. Now the holder of a claim can only be deemed unimpaired if the cash payment is *both* equal to the claim and includes postpetition interest.

*Plan Impairment Versus Statutory Impairment*

Instead of the narrower result of requiring solvent debtors to pay postpetition interest, Solow reads Congress's 1994 amendment to eliminate unimpairment even when the debtor pays 100% of a creditor's allowed claim, plus postpetition interest, because § 1124(1) of the Code uses the language "claim," not "allowed claim," to identify what the plan must leave unaltered. Thus, because PPI is proposing to pay Solow only the amount of his § 502(b)(6) capped rent claim plus interest, and not the total amount of the $4.7 million claim which Solow filed in this case, Solow claims that the plan fails to satisfy the requirements of unimpairment under § 1124(1), which states that in order to render a claim unimpaired the plan must "leave[ ] unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest."

■ Solow's position, however, confuses two distinct concepts: (i) plan impairment, under which the debtor alters the "legal, equitable, and contractual rights to which [their] claim entitles the holder of such claim," and (ii) statutory impairment, under which the operation of a provision of the Code alters the amount that the creditor is entitled to under nonbankruptcy law. By its very language, § 1124(1) embodies this distinction. It requires the plan to leave unaltered those rights to which the creditor's "claim or interest *entitles* the holder of such claim or interest." § 1124(1) (emphasis added). Note that the quoted provision does not say "entitles the holder under nonbankruptcy law"; it includes bankruptcy law and in this case § 502(b)(6) determines that entitlement. Thus, it is not PPI's Plan which proposes to alter Solow's rent claim; PPI's Plan provides for payment in full of the capped rent claim plus interest. Instead, it is the operation of the Code itself that has altered the $4.7 million amount owed by PPI. That $4.7 mil-

lion is not a right of payment to which Solow is entitled to as a result of his bankruptcy claim. In *In re American Solar King Corp.*, 90 B.R. 808 (Bankr.W.D.Tex.1988), the court articulated the distinction between plan impairment and statutory impairment. The *American Solar* court held that

> [a] closer inspection of the language employed in Section 1124(1) reveals [that] ... [i]mpairment results from what the plan does, not what the statute does.... If a plan leaves a claimholder subject to a given provision of the Code relating to the treatment of certain claims, the plan has certainly left unaltered the legal rights to which such claim entitles its holder.

*Id.* at 819–820; *see also In re Smith,* 123 B.R. 863, 867 (Bankr.C.D.Cal.1991) ("[A] plan may limit payment of claims to 'the extent allowed,' without impairing them; for until claims are allowed, or deemed allowed, the holders thereof are not entitled to distribution from the bankruptcy estate.")

Solow's interpretation of § 1124(1) would create perverse incentives for creditors filing claims. By Solow's reading, a plan could not treat as unimpaired any creditor's claim to which a party in interest objected pursuant to § 502(a) unless the plan treated the claim as the creditor originally filed it. As a result, creditors who filed inflated claims, disputed claims, or claims of questionable validity would be more likely to be impaired under a plan because in order to treat them as unimpaired, the plan would have to provide for those claims as originally filed, regardless of their adjudged validity. This would give creditors who sought voting rights in a bankruptcy plan a strategic incentive to file a claim that the debtor would be likely to dispute. Such a result could not have been intended by Congress.

Solow cites five cases to support his contention that "a class of claims that receives payment in cash in full is still impaired." (Doc. # 192 at 10) Each of these cases is distinguishable from the case at bar. In *Equitable Life Ins. Co. v. Atlanta–Stewart Partners (In re Atlanta–Stewart Partners),* 193 B.R. 79 (Bankr.N.D.Ga.1996), the court was asked to determine the adequacy of a disclosure statement which provided for the

payment of 95% of the allowed claims of an administrative convenience class of unsecured creditors. *Id.* at 80. Both the Office of the United States Trustee and a creditor objected to the disclosure statement on the grounds that the debtor artificially impaired the convenience class by paying only 95% rather than 100% of their claims. *Id.* The *Atlanta–Stewart* court rejected the artificial impairment challenge because, after the 1994 deletion of Section 1124(3), even a 100% payout to the convenience class would have rendered their allowed claims impaired. *Id.* at 82. However, the court did not reach the issue of whether those allowed claims, if paid in full with interest, would have been impaired. Moreover, the court did not hold that a class of claims would have to receive the entire amount of their claim, prior to the Section 502(a) allowance process, in order to be unimpaired.

Similarly, the decision in *In re Crosscreek Apartments, Ltd.,* 213 B.R. 521 (Bankr. E.D.Tenn.1997), which involved an artificial impairment challenge to a plan that paid allowed general unsecured claims 50% in cash on the effective date and the remaining 50% in cash 180 days after the effective date, without interest. *Id.* at 529. The court followed the reasoning of *Atlanta–Partners, id.* at 535–36, but again did not decide the issue of whether payment of the allowed claims in full with interest would have resulted in impairment nor did it decide whether § 1124(1) required the payment in full of the creditor's claim, as filed and before allowance.

*In re Seasons Apartments, Ltd. Partnership,* 215 B.R. 953 (Bankr.W.D.La.1997), is the only case that Solow cites which states that a creditor's "claim," and not their "allowed claim," must be left unaltered in order to be unimpaired. *Id.* at 959. However, in *Seasons,* like the cases discussed above, the debtor was attempting to classify the creditor as unimpaired despite the debtor's failure to pay the creditor postpetition interest on

their allowed claim. *Id.* at 956. Moreover, the *Seasons* court uses the distinction it makes between "claim" and "allowed claim" for the proposition that, while interest continues to accrue on an unsecured "claim" postpetition, it is often not paid pursuant to § 502(a)'s definition of an "allowed claim." Thus, the distinction the *Seasons* court makes between claim and allowed claim has everything to do with the issue of payment of postpetition interest under § 1124(1), and it has nothing to do with Solow's proposition that creditors must receive the full amount of their claim, prior to § 502(a) allowance, in order to be unimpaired.[14]

Pursuant to § 1124(1), PPI's plan "leaves unaltered the legal, equitable, and contractual rights to which [Solow's] claim ... entitles the holder of such claim." As noted above, Solow's claim must first have its entitlement limited by the application of § 502(b)(6). What remains is a simple monetary damage entitlement. Absent this bankruptcy case, Solow's entitlement is limited to a monetary damage award plus interest; he has no contractual rights or claims which PPI must preserve or cure. Solow cannot obtain enforcement of the various terms of the Lease—the Lease obligations are history. Absent this bankruptcy case, Solow's sole entitlement would be a money award for breach of contract and, presumably, that award would bear a statutory or case law determined interest rate from the date of the breach to the date of the judgment, and be entitled to postjudgment interest at the same rate or at a different rate, depending upon whether the judgment is that of a state court or a federal court. Subject to the § 502(b)(6) cap, that is exactly what the Plan proposes for Solow's claim. Thus, I conclude that Solow's entitlement is unaltered by the Plan and his claim is therefore unimpaired by the Plan.

---

14. The two other cases which Solow cites merit little discussion. In *PNC Bank v. Park Forest Dev. Corp. (In re Park Forest Dev. Corp.),* 197 B.R. 388 (Bankr.N.D.Ga.1996), the court cited *Atlanta–Stewart* for the proposition that deletion of § 1124(3) may have eliminated the mechanism of artificial impairment. This is not at issue in this

case. *In re Willow Creek Apartments,* 1996 WL 343450, at *2, 1996 LEXIS 1888, *6 n. 1 (Bankr. M.D.N.C. April 17, 1996), merely mentions, as dictum, *Atlanta–Stewart* in a footnote and again does not discuss the issue of payment of postpetition interest.

## CONCLUSION

For the reasons set forth above, I find that: (i) PPI, in filing its Chapter 11 petition for the primary purpose of capping Solow's rent claim pursuant to § 502(b)(6), did not file its petition in violation of the good faith filing doctrine, nor does Solow's capped claim treatment under the Plan constitute bad faith as contemplated by § 1129(a)(3); (ii) the proper amount of Solow's rent claim, as limited by § 502(b)(6), does not include late fees, nor attorneys' fees, and is properly reduced by $650,000, the amount of the security deposit that Solow applied subsequent to terminating PPI's lease; and (iii) Solow's capped rent claim, which pursuant to the Plan is to be paid on the effective date of the Plan in full in cash including pre and postpetition interest, is deemed unimpaired.

PPI's counsel should submit an order on notice.