**In re: Aiping HUANG, Debtor,**

**The Bank of China, Appellant,**

v.

**Aiping Huang, Appellee.**

**No. 00–57056.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 6, 2001

Filed Jan. 14, 2002

John A. Blue, Los Angeles, California, for the appellee.

Joshua D. Wayser, Santa Monica, California, for the appellant.

Before: NOONAN, WARDLAW, Circuit Judges and SCHWARZER,** Senior District Judge.

NOONAN, Circuit Judge:

Bank of China (the Bank) appeals the judgment of the district court reversing

** The Honorable William W Schwarzer, United States Senior District Judge for the Northern District of California, sitting by designation.

the summary judgment of the bankruptcy court in the Bank's favor in its suit against Aiping Huang (Huang). Holding that Huang is not collaterally estopped by her settlement with the Bank from denying the Bank's allegations of fraud, we affirm the judgment of the district court.

## PRIOR PROCEEDINGS

On October 21, 1996, the Bank brought suit in the district court against SV International, Inc. (SV), ZP Tech Inc. (ZP), Ruigao Trading Inc., Jiannan Zhang, Aiping Huang, and Lianping Pan. The Bank noted that it was wholly owned by the government of China and that its principal place of business was Beijing. The defendants were alleged to be California corporations or permanent residents of California. Pan and Huang were said to be husband and wife and the sole directors of SV, identified as the parent of a wholly-owned Chinese subsidiary, Nantong Starvest Data Company, Ltd. Pan and Huang were also said to be the only directors of Ruigao. Pan and Zhang, Huang's first cousin, were alleged to be the sole owners of ZP. The Bank further alleged that Pan, Huang, and Zhang together controlled SV, ZP, Ruigao, and Nantong Starvest. They also were alleged to control another Chinese company, Nantong Hong Yang Industries Co.

According to the Bank's complaint in its 1996 suit, Nantong Starvest in 1992 and 1993 obtained approximately $11,910,000 in term loans from the Bank, and $10,786,785 and 506,743,360 Japanese yen in letters of credit from the Bank. In addition, the Bank guaranteed a loan of $10,000,000 by the Arab Bank to Nantong Starvest. Over $110 million of computer diskettes were alleged to have been shipped to SV and ZP by Nantong Starvest at artificial and concealed prices, with the alleged intention of avoiding repayment of the credit extended by the Bank.

On the basis of these and other related allegations, the Bank's complaint against the six defendants alleged twelve causes of action, as follows: (1) breach of a written contract in failing to repay the loans; (2) money lent and received; (3) money had and received; (4) fraud; (5) breach of the covenant of good faith; (6) fraudulent conveyance; (7) intentional interference with the Bank's contractual relations with Nantong Starvest; (8) constructive trust; (9) injunctions; (10) accounting; (11) violation of 18 U.S.C. § 1962(c) (Racketeer Influenced Corrupt Organizations Act or RICO), charged against Pan, Huang, and Zhang; and (12) violations of subsection (d) of the same act, charged against the same three individuals.

The suit, styled *Bank of China v. SV International, Inc.*, was met by the defendants' denial of all claims. The defendants were represented by Manatt, Phelps & Phillips (MPP); the Bank by Stern, Neubauer, Greenwald & Pauly of Santa Monica and by Hollyer Brady Smith Troxell Barrett Rockett Hines & Mone of New York City. Between December 1996 and February 1997, MPP moved to strike portions of the complaint; to dismiss for failure to state a cause of action; and to stay discovery. The defendants lost these motions. Eventually settlement negotiations began and were actively pursued during May. On June 5, 1997, the Bank and the defendants entered into what was denominated a "Settlement Agreement, Security Agreement, and General Release" (the Settlement Agreement), a detailed document 18 pages in length.

In the Settlement Agreement the six defendants admitted that they, jointly and severally, owed the Bank $42,740,813.03 and 572,911,136 Japanese yen plus interest from October 24, 1996. They stipulated to

entry of judgment in the Bank's favor in the amount of $47,733,937.79, plus interest of 8% from October 24, 1996. The Settlement Agreement set out a schedule of payments with an initial payment in December, 1997, and quarterly payments to be made beginning on March 31, 1998 and ending on December 31, 2006. The Bank was given a security interest in all personal property and certain identified real estate of the individuals. The Bank was given complete access to "all information and documents concerning Defendants," including the income tax returns of the three individuals. The compensation of these individuals from businesses in which they had an interest was limited to a total of $100,000. The following provisions of particular pertinence here were also part of the settlement:

3. A. *Judgment Final and Binding.* The Bank and the Defendants agree that the Judgment shall constitute a binding and final adjudication of the parties' rights and liabilities in the Action, except that the Bank shall retain all further rights stated in this Agreement. The Bank and the Defendants hereby fully and forever waive any right to appeal, to bring post-trial motions, or to bring any other challenges to the Judgment. The Defendants acknowledge that the Judgment is final, valid and in full force and effect.

3. B. *Judgment and Debt Not Dischargeable in Bankruptcy.* Defendants are familiar with the law concerning the dischargeability of debts in bankruptcy. Defendants are also familiar with the facts, including their actions with respect to the Bank. Accordingly, and on this basis, Defendants understand, represent and promise to the Bank that the Judgment and the Debt, and all other amounts owing to the Bank, are not dischargeable in any bankruptcy or bankruptcies filed by any of the Individ-

ual Defendants; and Defendants shall not, and represent that they have no factual or legal basis to, challenge or otherwise dispute the Bank's request for an order in any bankruptcy court to establish the non-dischargeability of such obligations, and Defendants accordingly agree that such an order (and judgment thereon, if requested by the Bank) shall be issued by any bankruptcy court. Defendants further acknowledge and agree that the understandings, promises and representations set forth above, are essential to this Agreement and that, without such understandings, promises and representations, the Bank would not have entered into this Agreement, having done so based upon these understandings, promises and representations, without which the Bank would have proceeded with this Action....

15. B. *Bankruptcy.* Defendants hereby agree that, in consideration of the mutual covenants contained herein and for other good and valuable consideration (the receipt and sufficiency of which is hereby acknowledged): (a) Defendants shall not (i) file any voluntary petition under any Chapter of the Bankruptcy Code, Title 11, U.S.C.A. (hereinafter referred to as the "Bankruptcy Code") or in any manner to seek relief, protection, reorganization, liquidation, dissolution or similar relief for debts under any other local, state, federal or other insolvency laws or laws providing for relief of debtors in equity.... As consideration for the Bank's entering into this Agreement with Defendants, Defendants agree that should any of the Defendants be the subject of a bankruptcy proceeding, whether commenced voluntarily or involuntarily, the Bank shall have relief from the automatic stay to exercise the Bank's remedies under state and federal law, this Agreement

and the Judgment, and Defendants shall not contest the Bank's right to such relief. Defendants are aware that there may be case law which holds that such pre-petition waivers of relief from stay are unenforceable and agrees that in any bankruptcy, the Defendants will be deemed to have rejected and disavowed such case law. Defendants further agree and acknowledge that they are receiving valuable consideration under this Agreement, that the Bank is foregoing the exercise of its rights and remedies, that the Bank would be prejudiced if this waiver were not enforced in such bankruptcy proceeding and that Defendants' other creditors, if any, will not be prejudiced by enforcement of this waiver. But for Defendants agreeing to allow the Bank to have relief from the stay, the Bank would not have entered into this Agreement.

The Settlement Agreement was presented to United States District Judge Terry Hatter for approval. On July 10, 1997, Judge Hatter approved the settlement and entered judgment in the Bank's favor for the amount agreed upon.

### PRESENT PROCEEDINGS

Fourteen months later, on September 10, 1998, Huang filed for bankruptcy under Chapter 7. On December 14, 1998, the Bank filed an adversary proceeding objecting to discharge of Huang's debt to it. The Bank moved for summary judgment on the basis of the provision in the Settlement Agreement that the debt was not dischargeable. On February 8, 2000, the Bankruptcy Court so ruled.

Huang appealed to the Bankruptcy Appellate Panel, which transferred the case to Judge Hatter. On November 3, 2000, Judge Hatter reversed the order of the Bankruptcy Court. Judge Hatter reasoned:

Without a hearing, this Court received a settlement, a stipulation for the entry of a judgment, and a proposed judgment. The settlement, the parties' stipulation, and the Judgment did not include any of the underlying facts regarding Huang's allegedly fraudulent activities. Thus, Huang's fraud liability was not an essential part of this Court's Judgment and, on that basis, collateral estoppel does not apply in the bankruptcy proceeding. *United States v. International Bldg. Co.,* 345 U.S. 502, 505, 73 S.Ct. 807, 97 L.Ed. 1182 (1953).

The Bank appeals.

### ANALYSIS

■ *First.* It is against public policy for a debtor to waive the prepetition protection of the Bankruptcy Code. *Hayhoe v. Cole,* 226 B.R. 647, 651–54 (9th Cir.B.A.P. 1998). This prohibition of prepetition waiver has to be the law; otherwise, astute creditors would routinely require their debtors to waive. Accordingly, the district court held that the Settlement Agreement's provisions that the judgment and debt are not dischargeable, and that Huang will not enter bankruptcy, are unenforceable. The Bank did not appeal the decision of the district court on this point. It is the law of the case.

*Second.* Liability for fraud is not dischargeable in bankruptcy. 11 U.S.C. § 523(a)(2)(A). If Huang defrauded the Bank, her debt to it is non-dischargeable. To prevail, the Bank must prove the fraud, unless the Bank succeeds by collateral estoppel.

■ *Third.* In all cases "where it is sought to apply the estoppel of a judgment rendered upon one cause of action to matters arising in a suit upon a different cause of action, the inquiry must always be as to the point or question actually litigated and

determined in the original action; not what might have been thus litigated and determined. Only upon such matters is the judgment conclusive in another action." *United States v. International Bldg. Co.,* 345 U.S. 502, 505, 73 S.Ct. 807, 97 L.Ed. 1182 (1953), *quoting Cromwell v. County of Sac,* 94 U.S. 351, 352–53, 24 L.Ed. 195 (1876). Accordingly, our inquiry is whether the fraud allegedly committed by Huang was "actually litigated and determined" in the prior proceeding.

■ *Fourth.* Fraud, or facts showing fraud, are not mentioned in the Settlement Agreement or in the judgment enforcing it. Fraud, as the Bank earnestly points out, was one of the counts in its prior suit. Fraud is also part of the two RICO violations alleged, and arguably part of several of the other counts. But there were other counts, not necessarily involving fraud, in the complaint that was settled. The Bank argues that Huang could have been liable only on those counts involving fraud. But such a limitation on her possible liability is neither evident from the Settlement Agreement nor from the complaint. Huang was a defendant throughout the complaint. She settled all possible liabilities under it when she signed the Settlement Agreement.

The Bank argues that Huang's potential liability for fraud was part of the two months of negotiations that preceded settlement. That argument, in the end, cuts against the Bank. Fraud was being charged by the Bank. But, with apparent deliberateness, neither fraud, nor facts supporting the charge of fraud, are recited in the Settlement Agreement.

The omission of any mention of fraud is all the more striking when it is observed that the Bank was advised by experienced counsel, who must have been aware of what was required to constitute collateral estoppel. That the Bank's counsel was well aware that a debtor might not be able to waive bankruptcy protection is evidenced by the careful drafting by which the Bank attempted to preclude Huang from contesting the lawfulness of the waiver. The Bank knew it was running the risk of the waiver being void. The Bank, which the Settlement Agreement shows to have been in a dominant position, was unable to secure the one provision that would have led to collateral estoppel, that is, Huang's admission of fraud.

We cannot help noticing that it was only fourteen months after signing the Settlement Agreement that Huang repudiated her agreement not to enter bankruptcy. But we are not asked to judge her good faith, nor are we informed by the record as to the circumstances of her signing the Settlement Agreement or the circumstances bringing about her bankruptcy. We judge upon the basis of the Settlement Agreement as it is written, dancing around any admission of fraud and constituting no collateral estoppel upon which the Bank can now rely.

AFFIRMED.