### In re TEXAS RANGERS BASEBALL PARTNERS, Debtor.

### No. 10–43400 (DML).

United States Bankruptcy Court, N.D. Texas, Fort Worth Division.

June 22, 2010.

Martin A. Sosland, Weil, Gotshal & Manges, LLP, Dallas, TX, Ronit J. Berkovich, Weil, Gotshal & Manges, LLP, New York, NY, J. Robert Forshey, Jeff P. Prostok, Forshey & Prostok, LLP, Fort Worth, TX, for Debtor.

Lisa Laura Lambert, Meredyth Kippes, Office of the United States Trustee, Dallas, TX, for United States Trustee.

Daniel I. Morenoff, Jeffrey R. Fine, K & L Gates LLP, Dallas, TX, for Official Committee of Unsecured Creditors.

Michael Joseph Small, Foley & Lardner LLP, Chicago, IL, Craig H. Averch, White & Case, L.L.P., Los Angeles, CA, Robert A. Simon, Barlow, Garsek & Simon, LLP, Fort Worth, TX, Mary K. Braza, Foley & Lardner, Milwaukee, WI, for Rangers Baseball Express, LLC.

Thomas K. Schulte, David A. Sullivan, Jennifer C. DeMarco, Andrew Brozman, Jeff E. Butler, Laura J. McLaren, Clifford Chance U.S. LLP, New York, NY, Holland N. O'Neil, Andrew G. Spaniol, Gardere Wynne Sewell, LLP, Dallas, Tx, for GSP Finance LLC.

Stephen J. Shimshak, Philip A. Weintraub, Jordan E. Yarett, Brad S. Karp, Diane Meyers, William B. Michael, Erica G. Weinberger, Susanna M. Buergel, Paul, Weiss, Rifkind, Wharton, & Garrison LLP, New York, NY, Briana Leigh Cioni, Peter C. D'Apice, Heather J. Panko, Stutzman, Bromberg, Esserman & Plifka, PC, Dallas, TX, for Office of the Commissioner of Baseball.

Melinda C. Franek, Joseph S. Fabiani, Latham & Watkins, LLP, New York, NY,

Scott Mark DeWolf, Rochelle McCullough L.L.P., Dallas, TX, for JP Morgan Chase.

Dennis F. Dunne, Dennis C. O'Donnell, Milbank, Tweed, Hadley & McCoy LLP, New York, NY, Andrew M. Leblanc, Aaron L. Renenger, Milbank, Tweed, Hadley & McCoy LLP, Washington, DC, Daniel C. Steward, Vinson & Elkins, L.L.P., Dallas, TX, for Ad Hoc Group of First Lien Lenders.

### Memorandum Opinion

DENNIS MICHAEL LYNN, Bankruptcy Judge.

By order dated June 2, 2010 (the "June 2 Order"), the court posed five questions pertinent to the confirmability of the *Prepackaged Plan of Reorganization of Texas Rangers Baseball Partners under Chapter 11 of the Bankruptcy Code* filed by Debtor (the "Plan")[1] and invited interested parties to address those issues by briefs and at a hearing held on June 15, 2010 (the "Hearing").[2] The following parties filed briefs prior to the June 11 deadline set by the court addressing all or some of the issues: (1) Debtor; (2) jointly, the Ad Hoc Group of First Lien Lenders (the "Ad Hoc Group"), JP Morgan Chase Bank, N.A., as agent for the first lien lenders ("Chase"), and GSP Finance LLC as agent for the second lien lenders ("GSP" and, collectively with the Ad Hoc Group and Chase, the "Lenders"); (3) Rangers Baseball Express, LLC, proposed purchaser of Debtor's assets under the Plan ("Express"); and (4) the Official Committee of Unsecured Creditors (the "Committee"). In addition, the Office of the Commissioner of Baseball (the "BOC") filed a statement in support of the positions asserted by Debtor and Express in their briefs, and GSP filed a supplement to the Lenders' brief. On June 14, 2010, the BOC filed a response (the "Response") to the Lenders' brief that took issue with the statement of facts in that brief.[3]

At the Hearing the court received into evidence exhibits identified as necessary below. In addition, Debtor, the BOC, Express, the Lenders and the Committee argued their positions to the court.

This matter is subject to the court's core jurisdiction. 28 U.S.C. §§ 1334 and 157(b)(2)(L). This memorandum opinion embodies the court's findings of fact[4] and conclusions of law. FED. R. BANKR.P. 7052 and 9014.

---

1. On June 17, two days after the Hearing (as defined below), Debtor filed an amended plan. Among the changes from the Plan were provisions for payment of interest on the claims of unsecured creditors and on the claim of the Lenders (as defined below) (as to the latter, *see* 11 U.S.C. § 506(b) and *United States v. Ron Pair Enters.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)). References in this memorandum opinion to the Plan shall mean the plan initially filed; amended versions of the Plan will be indentified as such.

2. The court addresses these issues prior to a plan confirmation hearing in the interests of judicial economy and as authorized by FED. R. BANKR.P. 7042, incorporating FED.R.CIV.P. 42.

3. The Response was filed after the June 11 deadline (*see* June 2 Order, p. 3, ¶ 3) without leave of the court. The court, nevertheless, reviewed the Response. As acknowledged by the BOC (Response, p. 2), the issues that were addressed at the Hearing are legal issues. While the court may in the future have to determine whether the facts are as stated in the Lenders' brief or as related by the BOC, they do not affect the court's conclusions below.

4. The court has culled the facts given below from briefs and other filings rather than from the testimony of witnesses. Accordingly, except to the extent it discusses specific documentary evidence, the court does not intend to bind itself for purposes of future proceedings to particular findings of fact.

## I. Background

Debtor, a Texas general partnership of which Rangers Equity Holdings GP, LLC ("REHGP"), is a 1% general partner and Ranger Equity Holdings, L.P. ("REHLP" and, together with REHGP, the "Rangers Equity Owners"), is a 99% general partner,[5] owns and operates the Texas Rangers (the "Rangers"), a major league professional baseball club that makes its home in Arlington, Texas, approximately halfway between Dallas and Fort Worth. The Rangers Equity Owners are indirect subsidiaries of HSG Sports Group, LLC ("HSG") which, through other subsidiaries, has interests in other professional sports franchises. HSG, in turn, is largely owned and is controlled by Thomas O. Hicks ("Hicks"), a prominent North Texas entrepreneur.

The Lenders are creditors of HSG in an amount in excess of $525,000,000. Debtor has guaranteed and pledged its assets to secure $75,000,000 of that amount.[6] The various loan documents expressly cap Debtor's monetary obligation to the Lenders at that amount.

Debtor has not been profitable, at least since its acquisition by Hicks in 1998. During subsequent years its cash flow shortfalls were covered by advances by Hicks which by 2008 totaled over $100,000,000. In 2008, Hicks determined that he could not continue to advance funds to support Debtor, and he initiated a process that ultimately led to an agreement to sell the Rangers to Express. Moreover, as a result of HSG's troubles, the loans from the Lenders fell into default in March of 2009 due to the failure of HSG to pay an installment of interest.

In the meantime, to cover operating shortfalls and obtain other assistance, Debtor entered into certain agreements with an affiliate of the BOC. Over the period ending with commencement of this chapter 11 case, Debtor borrowed in excess of $20,000,000 pursuant to those agreements.[7] Those agreements also gave the BOC certain rights respecting sale of the Rangers.

In addition to the rights of the BOC as established by the agreements referred to in the preceding paragraph, Debtor is limited by the Major League Constitution (the "MLC"), the document governing major league baseball franchises, as to, *inter alia*, to whom it may sell the Rangers. It is the position of the BOC (with which Express and Debtor concur) that the MLC and the prepetition agreements respecting financing and other assistance that Debtor has entered into bar any sale of the Rangers not approved by the BOC and the requisite percentage of owners of other major league baseball franchises.

5. The "LP," meant to describe REHLP's structure, has apparently led some to refer to REHLP as a limited partner of Debtor and Debtor as a limited partnership. The Texas Rangers Baseball Partners Second Amended and Restated General Partnership Agreement (the "Partnership Agreement"), however, clearly establishes Debtor as a general partnership.

6. The court need not here consider the extent of the liability to the Lenders of the Rangers Equity Owners or other members of the HSG family. Suffice it to say that the Rangers Equity Owners are parties to the various loan documents, and, as Debtor is the only asset of REHGP and REHLP (except that the former is the subsidiary of the latter) and, so far as the record reflects, neither has any other liabilities, whatever value for equity is realized from Debtor's assets will eventually flow through them or HSG to the Lenders.

7. The court has also authorized post-petition borrowings from the same source, which has agreed to lend up to approximately $21,500,000 to Debtor. This is expected to cover cash flow shortfalls for the remainder of the 2010 baseball season.

The Lenders, on the other hand, pursuant to the Amended and Restated First Lien Pledge and Security Agreement (the "Pledge Agreement"),[8] argue that they also have the right to pass on any sale of the Rangers once their loan is in default. *See* Pledge Agreement §§ 4.4.1(c)(i)(3) and 4.4.2(b)(i), respectively giving Chase (as agent) (1) the power to control the equity interests of the Rangers Equity Owners following a default; and (2) approval rights as to any sale of the Rangers.

Exercising the rights of approval under section 4.4.2(b)(i), Chase, acting for the Lenders, declined to approve sale of the Rangers to Express. It is the position of the Lenders that one or more alternative purchasers exist who would pay more for the Rangers than will Express under the Assets Purchase Agreement between Debtor and Express (the "APA").[9] The BOC, on the other hand, asserts that Express was the prevailing bidder in a properly conducted, fair and transparent auction process and, accordingly, the sale to Express, approved by the BOC,[10] should be consummated.

Faced with an impasse, in that the Lenders would not consent to the sale to Express and the BOC would not agree to seek and consider alternate offers for the Rangers, Debtor filed this chapter 11 case. Upon filing, Debtor also filed the Plan, by which it proposes to consummate the APA. Under the Plan, the Lenders are to be paid $75,000,000 "in full satisfaction, settlement, release, and discharge of ..." their claims. Plan §§ 4.2(b) and 4.3(b). As this is the maximum Debtor can be required to pay the Lenders (Amended and Restated First Lien Credit and Guaranty Agreement (the "Loan Agreement") §§ 7.1 and 7.2), Debtor contends the Lenders are unimpaired under section 1124(1) of the Bankruptcy Code (the "Code")[11] and not entitled to vote on the Plan. Plan §§ 4.2(a) and 4.3(a).

The Lenders, however, insist that, due to HSG's default, no sale of the Rangers can be agreed to by the Rangers Equity Owners other than through Chase's action. They further argue that payment of the capped amount of $75,000,000 does not equate to unimpaired treatment under section 1124(1) of the Code. Rather, they insist Debtor must continue to fulfill all its obligations under the Loan Agreement, the Pledge Agreement and other documents respecting their loan in order for their treatment under a plan not to effect impairment. As the Plan does not give effect to Chase's right, acting for the Lenders, to

---

**8.** The loan documents evidencing the second lien holders' rights are, for purposes of this memorandum opinion, identical to the loan documents of the first lien holders. For convenience, the court will refer only to the latter.

**9.** The APA on which the Plan is based calls for a sale by Debtor of its assets to Express and is successor to an agreement entered into by Debtor and Express in January of 2010. The APA covers certain assets that were transferred to Debtor immediately prior to commencement of Debtor's chapter 11 case. Those assets would have passed from (in most cases) other members of the HSG family to Express in connection with the earlier agreement. Debtor also, just prior to case commencement, accepted responsibility for certain liabilities. The Lenders argue that these changes (as well as the addition of a "breakup" fee for the benefit of Express) make the APA a less attractive transaction for them than even the original agreement between Debtor and Express. Debtor disputes that the APA materially and adversely changed the transaction with Express.

**10.** Although the BOC has preliminarily approved the sale of the Rangers to Express, the BOC asserts that Express must yet be approved by a vote of 75% of the owners of major league baseball teams. MLC § 2(b)(2); Plan § 10.1(d).

**11.** 11 U.S.C. §§ 101 *et seq.*

consent to or approve the sale to Express, the Lenders claim they are impaired and so entitled to vote on the Plan.

Following initial hearings in this chapter 11 case, the Lenders commenced involuntary chapter 11 cases against REHGP and REHLP. At this writing those cases are pending, and the court has scheduled a status conference in the cases for June 22, 2010. The Lenders have also commenced an adversary proceeding against Debtor on a fraudulent transfer theory respecting one of the assets transferred into Debtor by another member of the HSG family immediately prior to commencement of this case.

Finally, at the suggestion of the court, the parties—*inter alia,* Debtor, the BOC, the Lenders and Express—have agreed to attempt to mediate the various disputes surrounding sale of the Rangers. The court has appointed Hon. Russell F. Nelms to serve as mediator.

## II. Issues

The court, in accordance with the June 2 Order, must now address the following four issues: [12]

1. Does Debtor have a duty as a debtor-in-possession to maximize the value of its estate, given that the Plan provides for full satisfaction of all claims against Debtor and substantial return to 100% consenting equity?

2. Who is entitled to speak for REHLP and REHGP, the Lenders or those entities' management?

3. What duties do REHLP and REHGP owe to the Lenders? [13]

4. Under the Plan are either of the classes consisting of the Lenders or that of the Rangers Equity Owners impaired within the meaning of the Code § 1124? [14]

## III. Discussion

### A. Duty to Maximize Value

■ The Lenders cite several cases (including one decided by this court) in support of their argument that Debtor must seek out the highest possible economic return for its assets; it is the contention of the Lenders that Debtor has a duty to test the purchase offer of Express in the market place to see if it can do better.[15] The cases cited by the Lenders are, however, inapposite.[16] In none of these cases did the court directly face the value maximization issue where the facts were that (1) the debtor was clearly solvent and paying

---

**12.** The fifth issue posed by the June 2 Order concerned the disclosure statement filed by Debtor. That question was disposed of at the time of the Hearing.

**13.** This issue was posed more generally in the June 2 Order, but, as a practical matter, it need only be dealt with as here stated. This is not to say that there are not constituencies—for example, the Rangers' fans and the City of Arlington—that appropriately expect the Rangers Equity Owners to take their interests into account in the management and disposition of the Rangers.

**14.** This issue was posed as to other classes of creditors in the June 2 Order but, as noted elsewhere in this memorandum opinion, as to other classes of creditors, was resolved by Debtor at the Hearing.

**15.** The Lenders offered several exhibits that suggest that a better offer might be had. For purposes of this memorandum opinion, without considering those exhibits, the court necessarily assumes Debtor might obtain a better offer than that represented by the APA.

**16.** The Lenders quote this court as finding it to be "unquestionably true that Debtors' officers and directors have a duty to maximize Debtors' estates to the benefit of shareholders as well as creditors." *In re Pilgrim's Pride,* 407 B.R. 211, 218 (Bankr.N.D.Tex.2009). The opinion in which that quotation appears addressed the question of whether or not to direct appointment an equity committee in the case. Specifically, it appears in a discussion about whether or not equity was adequately represented in the chapter 11 case

creditors in full and (2) all the equity owners had consented to accept a transaction that provided to them less than their potential maximum recovery. In the case at bar, the Plan proposes (the court assumes accurately) to pay all creditors in full, and the Rangers Equity Owners have (subject to the discussion below) agreed to the sale to Express.

■ It is an underlying premise of the Code that parties should be allowed to structure their own resolutions in cases respecting how claims and interests will be satisfied from a debtor's estate. *See, e.g., In re Smith,* 415 B.R. 222 (Bankr.N.D.Tex. 2009) (noting that one of the factors a court must consider when determining whether to abstain from hearing a case pursuant to Code § 305(a)(1) is "whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case"); *In re Colonial Ford, Inc.,* 24 B.R. 1014 (Bankr.D.Utah 1982). Indeed, the Code itself explicitly contemplates that a class of creditors or equity

owners may choose to accept less recovery than the class might be entitled to. Code § 1129(a)(7)(A)(i) excepts from testing under the so-called best interest of creditors (or equity interest owners) test treatment of a class that has been accepted by all members of the class; similarly sections 1123(a)(4) and 1129(a)(9), *e.g.,* specifically allow for a party to agree to less favorable treatment than the party would otherwise be entitled to.

Allowing a class to elect less than optimal treatment is sensible. A class—particularly one of equity interests—may have motives other than maximizing return. For example, a class of trade creditors or equity owners may elect to give up value to maintain business relationships or continue particular management in control of a debtor. In a case such as that at bar, equity owners may favor one purchaser over another because of an interest in maintaining the debtor's location.

In the case at bar, Debtor claims that the Plan provides for full payment of all creditors of Debtor and that 100% of its

absent appointment of an equity committee, and it is therefore not only dicta but was offered in a context too remote from that of the case at bar to be relevant. Rather, the quoted language was part of the court's explanation that simply maximizing a debtor's estate, in and of itself, does not ensure that equity owners are adequately represented.

The Lenders also cite *Louisiana World Exposition v. Federal Ins. Co.,* 858 F.2d 233 (5th Cir.1988), which in turn quotes the Supreme Court in *Commodity Futures Trading Com. v. Weintraub,* 471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985), as saying that a trustee in bankruptcy (and therefore a debtor-in-possession) "has the duty to maximize the value of the estate...." An issue in *Louisiana World Exposition* was whether the debtor had a duty to initiate a lawsuit if doing so would maximize the value of the estate. The court concluded that the debtor did have such a duty. The Lenders also cite *In re Kazis,* 257 B.R. 112, 114 (Bankr.D.Mass.2001). There the court

noted that a chapter 7 trustee has a duty to maximize value in liquidating the debtor's assets, especially if doing so could result in payment in full to creditors and a return to debtor. In the instant case, creditors are paid in full, and there is a return to equity. The Lenders also cite *In re Big Rivers,* 233 B.R. 726, 735 (Bankr.W.D.Ky.1998). In that case, one issue was whether a provision in a prepetition contract that prevented the debtor from maximizing the value of the estate was void in bankruptcy. The court held that such a provision was void as a matter of law. Finally, the Lenders cite *In re Philadelphia Athletic Club, Inc.,* 15 B.R. 60, 62 (Bankr.E.D.Pa.1981). In that case, the court concluded that it was not sufficient that creditors and administrative expenses would be paid in full if there was an alternative bid on the table that would also provide a return to equity. In the instant case, however, not only is there a return to equity, but equity has arguably acquiesced in the return.

equity interests have accepted the Plan. If this is so—and, as discussed below, it is not clear that it is—the Plan is confirmable even if a better offer for purchase of the Rangers could be had. The court thus concludes that Debtor does not have a duty to maximize the value obtained for its estate.[17]

### B. Authority to Act for the Rangers Equity Owners

■ The Lenders argue that, upon the occurrence of an event of default, pursuant to section 4.4.1(c)(i)(3)[18] of the Pledge Agreement, management of the Rangers

17. This is not to say that the Rangers Equity Owners are necessarily free to accept a plan that will not maximize value for their creditors.

18. Sections 4.4.1(c)(i)(3), employing marvelously opaque language, reads:
 (c) Voting and Distributions.
 . . .
 (3) Upon the occurrence and during the continuation of an Event of Default:
 (A) all rights of each Grantor to exercise or refrain from exercising the voting and other consensual rights which it would otherwise be entitled to exercise pursuant hereto shall cease and all such rights shall thereupon become vested in the Collateral Agent who shall thereupon have the sole right to exercise such' voting and other consensual rights; and
 (B) in order to permit the Collateral Agent to exercise the voting and other consensual rights to which it may be entitled to exercise pursuant hereto and to receive all dividends and other distributions which it may be entitled to receive hereunder: (1) each Grantor shall promptly execute and deliver (or cause to be executed and delivered) to the Collateral Agent all proxies, dividend payment orders and other instruments as the Collateral Agent may from time to time reasonably request and (2) each Grantor acknowledges that the Collateral Agent may utilize the power of attorney set forth in Section 6.1.

19. The Rangers Equity Owners were not originally parties to the Pledge Agreement but

Equity Owners automatically lost and Chase acquired the right "to exercise or refrain from exercising the voting and other consensual rights" of REHLP.[19] Thus, as their loans are in default, the Lenders contend it is Chase that must authorize the sale of the Rangers, and the execution of the APA by REHLP is *ultra vires* and void.

■ Debtor and Express (joined by the BOC) respond that section 10.23 of the Loan Agreement[20] prevents the Lenders from taking control of REHLP. Section 10.23, together with a parallel provision of

were added as parties by supplements dated August 25, 2008. The Lenders only assert the right to control the voting and consensual rights of REHLP (Lenders' brief, pp. 28–29)

20. Section 10.23 of the Loan Agreement states:
 10.23. **Major League Baseball Requirements.** Notwithstanding any contrary provisions contained in this Agreement or any other Credit Document:
 (a) each of the Lenders is aware of the provisions contained in Article V, Section 2(b)(2) of the Major League Constitution, and recognizes that the Ownership Committee of Baseball has issued "Control Interest Transfers—Guidelines & Procedures", dated November 9, 2005 (such document and any successor guidelines, as may be amended from time to time, the "**MLB Control Interest Transfer Guidelines**");
 (b) each of Lenders acknowledges that Article V, Section (2)(b)(2) of the Major League Constitution and the MLB Control Interest Transfer Guidelines require that the transfer of a control interest in either the Rangers Franchise or the Rangers be subject to the approving vote of the Major League Baseball clubs in their absolute discretion. Each of the Lenders also acknowledges the "best interest of baseball" powers held by the Commisioner under the Major Leage Constitution. Accordingly, each Lender acknowledges that such approvals would be required for any sale or transfer of the

the Pledge Agreement (section 11(c)), which they argue by its terms overrides section 4.4.1(c)(i)(3) of the Pledge Agreement, makes the rights of Chase, acting for the Lenders, to exercise control over Debtor or its owners subject to the MLC. Because the MLC requires that any change in control of the Rangers be approved by the BOC and/or the requisite majority of baseball team owners,[21] the approval of the BOC and the major league owners, as required by the MLC, must be obtained for Chase to control the Rangers Equity Owners, and, through them, Debtor and the Rangers. As the Lenders have not obtained such approval, it follows, according to Debtor and Express, that Chase is not entitled to exercise control as permitted by section 4.4.1(c)(i)(3) of the Pledge Agreement.[22]

It is not clear to the court that the MLC abrogates the rights of Chase under section 4.4.1(c)(i)(3) such that management of

Rangers Franchise or the Rangers, or an interest in either the Rangers Franchise or the Rangers, or any sale, transfer, assignment, license, sublease, or other conveyance of the trademarks, trade names and other intellectual property rights owned by the Rangers, to a third party as well as to any Lender, and that each such transaction shall be subject to and made in accordance with the Major League Constitution, the [sic] each agency agreement and operating guidelines among the Major League Baseball clubs and an MLB Entity (as defined below) and the MLB Control Interest Transfer Guidelines.

(c) Each Lender acknowledges that any temporary or permanent management of the Rangers Franchise or the Rangers shall be subject to the prior approval of the Commissioner and the Clubs. In the event any Lender(s) desires to operate the Rangers Franchise or the Rangers for its own account on a temporary or permanent basis, such Lender(s) shall seek the prior approval of the Commissioner and the Major League Baseball clubs in accordance with the Major League Constitution and the MLB Control Interest Transfer Guidelines.

(d) This Agreement and any rights or exclusivities granted by the Rangers hereunder, in respect of the Collateral and other intellectual property rights owned by the Rangers, shall in all respects be subject to each of the following, as may be amended from time to time (collectively, "**MLB Documents**"): (i) any present or future agreements entered into by, or on behalf of, any of the Major League Baseball entities or affiliates (each, an "**MLB Entity**"), or the Major League Baseball clubs acting collectively, including, without limitation, agreements entered into pursuant to the Major League Constitution, the American and National League Constitutions (to the extent of any continuing applicability), the Professional Baseball Agreement, the Major League Rules, the Interactive Media Rights Agreement, and each agency agreement and operating guidelines among the Major League Clubs and an MLB Entity, or (ii) the present and future mandates, rules, regulations, policies, bulletins or directives issued or adopted by the Commissioner or the MLB Entities; *provided, however,* that the foregoing is not intended to require any Lender to subordinate the security interests granted to it hereunder in favor of any Person.

21. The court, at the insistence of the BOC, does not in this memorandum opinion address the effectiveness of the MLC limitations on Debtor (or the Rangers Equity Owners) in a bankruptcy context. Consequently, while the MLC assuredly can affect the Lenders' contractual rights, the court assumes, for the purpose of this memorandum opinion, that the MLC does not prevent Debtor and the Rangers Equity Owners from considering alternatives to the APA.

22. Regardless of who controls the Rangers Equity Owners, pursuant to Pledge Agreement § 4.4.2(b)(i) a sale of the Rangers requires the "prior written consent" of Chase whether or not a default triggering section 4.4.1(c)(i)(3) has occurred. While this limitation will not affect the power of a trustee or debtor-in-possession in a bankruptcy case to use, sell or lease estate property, including the Rangers, it would be valid and enforceable outside of bankruptcy.

the Rangers Equity Owners retains all decision-making power for those entities. However, the Lenders have acquiesced in continued control of Debtor, REHGP and REHLP by the management of the Rangers Equity Owners for all purposes since their loan went into default. They have allowed the Rangers Equity Owners to act in connection with the sale process up to the point of the agreement to sell to Express. They have not disputed the authority of the Rangers Equity Owners to cause Debtor's commencement of this chapter 11 case. Most tellingly, perhaps, they have commenced involuntary chapter 11 cases against REHLP and REHGP. Were they, as they argue, entitled to act for the Rangers Equity Owners, they would have, through Chase, commenced voluntary cases instead.

The court thus concludes that, at this writing, management of REHLP and REHGP continues to speak for those entities. Moreover, the court agrees with Debtor that, given the pendency of the bankruptcy cases of the Rangers Equity Owners, any effort on the part of Chase to enforce its contractual right to control either entity or Debtor would amount to a violation of the automatic stay of Code § 362(a).[23] *See In re Bicoastal Corp.*, 1989 WL 607352, at *5 (Bankr.M.D.Fla. Nov.21, 1989) (holding that a lender's attempt to elect a new board of directors would be a violation of the automatic stay because the only reason for electing a new board would be to ensure payment of their claims).

## C. Duties of the Rangers Equity Owners

■ Debtor and Express argue that the Rangers Equity Owners, as alleged debt-

ors, owe no duty to anyone that they would not owe a duty to outside of bankruptcy. While this means management of the Rangers Equity Owners is obligated to exercise sound business judgment (*see Campbell v. Walker*, 2000 WL 19143, 2000 Tex.App. LEXIS 269 (Tex.App.-Houston [14th Dist.] Jan. 13, 2000); *see also Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168 (Del.Ch.2006) ("[T]he business judgment rule protects directors of solvent, barely solvent, and insolvent corporations ....")), the alleged debtors are not fiduciaries for their creditors and, in particular, are not statutory fiduciaries whose acts are subject to the limitations of the Code and control of the court.

In support of this position Debtor points to section 303(f) of the Code. Section 303(f), applicable in involuntarily commenced bankruptcy cases, provides:

> (f) Notwithstanding section 363 of this title, except to the extent that the court orders otherwise, and until an order for relief in the case, any business of the debtor may continue to operate, and the debtor may continue to use, acquire, or dispose of property as if an involuntary case concerning the debtor had not been commenced.

Thus, Debtor insists, REHGP and REHLP may proceed without court oversight as they deem proper respecting the Plan so long as their conduct can be justified under the business judgment rule. *See Consolidated Partners Inv. Co. v. Lake*, 152 B.R. 485, 490 (Bankr.N.D.Ohio 1993) ("By virtue of § 303(f), during the

---

**23.** The Lenders have informed the court that they anticipate seeking relief from the stay so that Chase may exercise its rights under section 4.4.1(c)(i)(3). While the court will, of course, consider such a motion upon its filing, so long as the court is satisfied that the Rang-

ers Equity Owners are acting consistently with protection of the Lenders' interests, it is unlikely, especially given the potential complications resulting from the MLC, that such a motion would be granted.

gap period, the Debtor was authorized to continue such operation until an order for relief was entered as though no involuntary petition had been filed. The rationale for allowing the debtor to operate during the involuntary gap period is that prior to the entry of an order for relief, the subject of an involuntary petition should not be adversely affected by the case."); *see also* 7 COLLIER ON BANKRUPTCY ¶ 1108.06 (16th ed. 2009).

■ The court agrees that this is an accurate statement of the law. In the context of the case at bar, however, it is clear that the court should invoke its authority to "order[ ] otherwise" and require that, even prior to entry of an order for relief, REHGP and REHLP manage their sole asset—Debtor—in a fashion consistent with the fiduciary responsibilities of debtors-in-possession. The court therefore by separate order has directed that section 303(f) will not apply in the cases of REHLP and REHGP.[24]

■ During the Hearing, the parties acknowledged that, without the benefit of section 303(f), an involuntary debtor would have the duty to deal with its property under section 363 as would a trustee. The court thus holds that, as a result of its abrogation in their cases of section 303(f), the Rangers Equity Owners have the same fiduciary duty to their creditors—the Lenders—as would a trustee.

---

**24.** Even if the court did not restrict the Rangers Equity Owners as permitted by Code § 303(f), as managers of Debtor, the Rangers Equity Owners act in a fiduciary capacity in Debtor's case and are responsible to the court. *See Weintraub,* 471 U.S. at 355, 105 S.Ct. 1986 ("Indeed, the willingness of courts to leave debtors in possession 'is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee.' ") (quoting *Wolf v. Weinstein,* 372 U.S. 633, 649–52, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963)); *Tenn–Fla Partners v. First Union*

## D. Impairment

As a result of changes to the Plan announced by Debtor at the Hearing, the issue of impairment is now limited to assessing the treatment of the Lenders and the Rangers Equity Owners.[25] The court concludes that, absent further modification of the Plan, the Lenders are impaired. The court further concludes that the Rangers Equity Owners are impaired and that the modifications of the Plan necessary to leave the Lenders unimpaired (as well as changes made to the Plan in the June 17 amendments), are such that, if there was prepetition acceptance of the Plan by the Rangers Equity Owners that acceptance is not binding on them and is subject to revocation (*see* Code § 1127(d)).

### 1. The Lenders

■ Debtor argues that, by providing in the Plan for payment of the capped amount of its guaranty ($75,000,000), it has left the Lenders unimpaired under Code § 1124(1). The Lenders, on the other hand, assert that, in order for them to be unimpaired under section 1124(1) they must retain all their rights under the Loan Agreement, the Pledge Agreement and their other credit documents, including their rights under sections 4.4.1(c)(i)(3) and 4.4.2(b)(i) of the Pledge Agreement. This, in turn, according to the Lenders, requires

---

*Nat'l Bank of Fla.,* 229 B.R. 720 (W.D.Tenn. 1999).

**25.** Debtor, at the Hearing, agreed that the treatment of unsecured creditors under the Plan would be modified to provide for payment to them of interest to the extent of their entitlement under their agreements with Debtor or applicable law. The amended version of the Plan filed June 17 so provides. The amended version of the Plan also provides for payment of interest on the $75,000,000 to the Lenders from the petition date.

that, for them to be unimpaired, they must have the ability to veto sale of the Rangers under the APA.

Section 1124 defines impairment as being any treatment other than treatment as provided by section 1124(1) or (2).[26] Prior to 1994, payment in full and in cash of a claim also constituted unimpaired treatment. *See* former section 1124(3); *In re New Valley Corp.*, 168 B.R. 73, 79 (Bankr. D.N.J.1994) ("[P]ursuant to section 1124(3) if each member of a class of claims receives full payment of its pre-petition allowed claim in cash, on the effective date of the plan, the class is unimpaired.").[27] Since the 1994 amendment of section 1124, some courts have held that payment of a claim in full in cash constitutes unimpaired treatment so long as post-petition interest

is also paid on the claim. *See, e.g., Solow Building Co. v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.)*, 324 F.3d 197, 205–07 (3d Cir.2003);[28] *In re G–1 Holdings Inc.*, 420 B.R. 216, 254–55 (Bankr.D.N.J.2009) (Chief District Judge Brown and Bankruptcy Judge Gambardella sitting jointly); *In re PPI Enters.*, 228 B.R. 339, 354 (Bankr.D.Del.1998).

■ The court in general agrees with these decisions.[29] A claim is to be quantified "as of the date of the filing of the petition." Code § 502(b). Thus, if a creditor receives under a plan everything to which the creditor would be entitled in a judgment entered immediately following the plan's effective date, the creditor is receiving treatment that, as required by section 1124(1), honors all the creditor's

---

**26.** Debtor cannot take advantage of section 1124(2), which requires cure of at least monetary defaults and, in the case at bar, would necessitate cure at the HSG level.

**27.** Congress cited specifically to *New Valley* in explaining why it eliminated section 1124(3). Congress disapproved *New Valley* because the court denied the creditors post-petition interest. *See* H.R.Rep. No. 103–835, at 47–48 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3340, 3356–57 ("In a recent Bankruptcy Court decision [*New Valley*], unsecured creditors were denied the right to receive post petition interest. . . . In order to preclude this unfair result in the future, the Committee finds it appropriate to delete section 1124(3) from the Bankruptcy Code. As a result of this change, if a plan proposed to pay a class of claims in cash in the full allowed amount of the claims, the class would be impaired, entitling creditors to vote for or against the plan of reorganization.' ").

**28.** In *Solow*, the Court of Appeals for the Third Circuit wrote:
The Bankruptcy Court also held that §§ 1124(1) and 1124(3) offered different tests for nonimpairment: "Section 1124(3) created nonimpairment status by a cash payment equal to the allowed amount of the claim but without postpetition interest. Such treatment could not qualify for non-

impairment under § 1124(1) because the failure to pay postpetition interest does not leave unaltered the contractual or legal rights of the claim." *PPI Enterprises*, 228 B.R. at 352.
In other words, § 1124(1) and § 1124(3) were different exceptions to the presumption of impairment, and the repeal of one should not affect the other. We agree with the Bankruptcy Court's analysis. Contrary to Solow's representations, the legislative history does not reflect a sweeping intent by Congress to give impaired status to creditors more freely outside the postpetition interest context. Instead, as the Bankruptcy Court noted, the legislative history accompanying the repeal of § 1124(3) indicated the "principal change" in the repeal "relates to the award of post petition interest." The congressional committee specifically referenced the *New Valley* decision without referencing the text of § 1124(1) or the many cases addressing its provisions, including *Solar King*. Therefore, the legislative history supports our holding.

**29.** In prior cases, this court has accepted such treatment as unimpaired. *See, e.g., In re Pilgrim's Pride Corporation*, No. 10–45664 (Bankr.N.D.Tex.2009) (findings of fact, conclusions of law and order confirming debtors' chapter 11 plan) (docket No. 4399).

"legal, equitable, and contractual rights." For the typical unsecured creditor, those rights equate to payment of the debt owed with interest as allowed by law. *See Solow*, 324 F.3d at 205–07.

█ The Lenders, however, have rights *vis-à-vis* Debtor other than just payment of the $75,000,000 for which Debtor is obligated to them.[30] Debtor is part of the HSG family of entities, and, as such, it has assumed obligations to the Lenders in addition to the guaranty.[31] In order for the Lenders to be unimpaired, their treatment under a plan must recognize and preserve those rights. In the context presented to the court, this, in turn, presents the question of whether a plan providing for the sale of the Rangers, to leave the Lenders unimpaired, must give effect to sections 4.4.1(c)(i)(3) and 4.4.2(b)(i) of the Pledge Agreement. In other words, must the plan grant the Lenders an effective veto over any proposed sale of the Rangers? The court concludes section 1124(1) does not so require.

█ First, unlike treatment under section 1124(2), section 1124(1) is prospective: section 1124(1) does not require that a plan provide for the cure of defaults—i.e., recreation of the situation as it was before default. Rather it requires that, as of the plan's effective date, an unimpaired creditor be able thereafter to exercise all its rights *vis-à-vis* its debtor. *See Bustop*

30. As HSG's obligation to the Lenders will not be satisfied in full following implementation of the Plan, the various agreements between the HSG family (including Debtor) and the Lenders will continue in full force and effect. The court has found no case (and the parties have cited no case) that involved facts similar to those in the case at bar.

31. For example, sections 5.2 and 5.3 of the Loan Agreement provide:

> **5.2 Existence.** Except as otherwise permitted under Section 6.9, [ HSG's parent] and each Credit Party [including Debtor] will, and will cause each of its Subsidiaries to, at all times preserve and keep in full force and effect (a) its existence; *provided*, neither Holdings nor any Credit Party or any of its Subsidiaries other than Company shall be required to preserve any such existence if such Person's board of directors (or similar governing body) shall determine that the preservation thereof is no longer desirable in the conduct of the business of such Person, and that the loss thereof is not disadvantageous in any material respect to such Person or to Lenders or (b) all rights and franchises, licenses and permits the failure of which to preserve and keep in full force and effect could not reasonably be expected to have a Material Adverse Effect.
> **5.3 Payment of Taxes and Claims.** Each Credit Party [including Debtor] will, and will cause each of its Subsidiaries to, pay all Taxes imposed upon it or any of its properties or assets or in respect of any of its income, businesses or franchises before any penalty or fine accrues thereon, and all claims (including claims for labor, services, materials and supplies) for sums that have become due and payable and that by law become a Lien upon any of its properties or assets, prior to the time when any penalty or fine shall be incurred with respect thereto; *provided*, no such Tax or claim need be paid if (i) it is being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, so long as (a) adequate reserve or other appropriate provision, as shall be required in conformity with GAAP shall have been made therefor, and (b) in the case of a Tax or claim which has or may become a Lien against any of the Collateral, such contest proceedings conclusively operate to stay the sale of any portion of the Collateral to satisfy such Tax or claim or(ii) such non-payment would not reasonably be expected to have a Material Adverse Effect. No Credit Party will, nor will it permit any of its Subsidiaries to, file or consent to the filing of any consolidated income tax return with any Person (other than Holdings or any of its Subsidiaries).

> Section 6.9 of the Loan Agreement also prohibits Debtor from merging or forfeiting its existence or taking other actions that would effect fundamental changes in its structure.

*Shelters of Louisville, Inc. v. Classic Homes, Inc.*, 914 F.2d 810, 814–15 (6th Cir.1990) ("Unless the plan ... limits Citizens' right to proceed against [Debtor], then the plan 'leaves unaltered the legal, equitable, and contractual rights to which such claim ... entitles the holder of such claim or interest'."). Under the Plan (presumably including any amended version), the sale of the Rangers will occur on the effective date. *See* Plan §§ 1.34, 6.1(a) and 10.1. Thereafter, the Lenders, if treated under section 1124(1), must be able to exercise their rights under their loan documents *vis-à-vis* Debtor (though those rights may have lost much of their usefulness) and other members of the HSG family.

■ As the sale of the Rangers will have been consummated at that point, however, the Lenders' rights under the Pledge Agreement will not affect the sale.[32] As would be the case with a breach outside of bankruptcy, except to the extent the Code excuses such a breach as a matter of law, if the Lenders are damaged by the actions of Debtor or the Rangers Equity Owners or their parents through a pre-effective date failure to honor the Lenders' rights under section 4.4.1(c)(i)(3) or 4.4.2(b)(i),[33] they may assert in this court a claim against Debtor for their damages[34] or pursue its affiliates in an appropriate forum.

■ Second, the preceding analysis is supported by applying the ordinary rules of statutory construction to Code § 1124. Section 1124 states:

Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan—

(1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or

(2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—

(A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title or of a kind that section 365(b)(2) expressly does not require to be cured;

(B) reinstates the maturity of such claim or interest as such maturity existed before such default;

(C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law;

(D) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a

---

**32.** Section 1124(1) does not require that, post-effective date, a lender's collateral must be what it was prior to that point in time.

**33.** Were the powers accorded the Lenders "interests," as that term is used in Code § 363(f) or (h), the court might conclude that unimpairment requires recognition of those rights in connection with any transaction consummated pursuant to the Plan. As the Rangers could be sold under section 363(b) by a

trustee without compliance with Credit Agreement §§ 4.4.1(c)(i)(3) or 4.4.2(b)(i) and without protecting the Lenders as to such provisions under section 363(f) or (h), the court concludes that a failure to honor those provisions in the Plan or the APA does not alone amount to impairment.

**34.** The court does not mean to imply that it believes that the Lenders have such a claim.

default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and

(E) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

When construing two provisions in such close proximity as subsections (1) and (2) of section 1124, the court must assume the legislature had good reasons for the differences between them. *Keene Corp. v. United States*, 508 U.S. 200, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993) ("Where Congress includes particular language in one section of a statute but omits it in another ... it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quoting *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983)). Thus, the fact that Congress provided in section 1124(2) that unimpaired treatment must include cure of most defaults but did not do so in section 1124(1) indicates that the intent of legislators was that unimpaired treatment under the latter provision would include, once that treatment became effective, allowing the class so treated to pursue remedies not otherwise in conflict with the Code, the plan or bankruptcy court orders for defaults existing as of the effective date.

Two illustrations will assist in explaining the court's construction of section 1124(1). A party to an agreement to purchase property of the debtor, which purchaser has a contractual right to specific performance as an alternative to damages, could be treated as unimpaired under section 1124(1) even if the property subject to the agreement were sold during the debtor's case or pursuant to the plan. That creditor would be entitled post-effective date to pursue a claim against the debtor just as it could have absent bankruptcy if the debtor defaulted such that specific performance of the sale agreement had become impossible.

Likewise, a party that is the beneficiary of an *ipso facto* clause, *e.g.*, giving it rights upon commencement of a bankruptcy case, if treated under section 1124(1) could enforce the *ipso facto* clause after the plan's effective date to the extent the bankruptcy filing default survived under the parties' agreement. Enforcement of the clause post-effective date, however, could not affect transactions authorized by confirmation of the plan or that occurred in the debtor's case prior to the effective date. Likewise, that the plan provided treatment allowing post-effective date enforcement of the *ipso facto* clause would not mean its enforcement was allowed for any purposes prior to the effective date, including in connection with acceptance and confirmation of the plan.

Third, to permit Chase, acting for the Lenders, to exercise the rights under section 4.4.1(c)(i)(3) or 4.4.2(b)(i) of the Pledge Agreement prior to the effective date, while Debtor and its owners are in the custody of the court, would give the Lenders a degree of control over the conduct of this case that is inconsistent with the Code and contrary to public policy.[35] At the

**35.** The disfavor for contractual restrictions on lease, sale or use of property by a trustee or debtor-in-possession is illustrated by provisions like Code §§ 363(1); 365(b)(2), (c) and (e)(1); 541(c)(1); and 1124(2)(A) and (D). Similarly, courts have declined to enforce

prepetition agreements respecting relief from the automatic stay. *See, e.g., Bank of China v. Huang (In re Huang)*, 275 F.3d 1173, 1177 (9th Cir.2002) ("The prohibition of prepetition waiver has to be the law; otherwise, astute creditors would routinely require their debt-

Hearing the Lenders agreed that a trustee appointed in this case could sell the Rangers without regard to the provisions of the Pledge Agreement. *See* Hearing transcript p. 127, 1. 14–p. 129, 1. 12. As a sale of the Rangers, whether under Code § 363 or under a plan, by Debtor acting as a debtor-in-possession is a transaction undertaken by Debtor in its role as a fiduciary, it would be inconsistent with the authority and responsibility conferred on that fiduciary by law to give effect to a contractual provision that would frustrate its performance of its fiduciary duties.

 Fourth, in order for Chase to utilize section 4.4.1(c)(i)(3) prior to confirmation of the Plan, it would have to obtain relief from the automatic stay of Code § 362(a). Absent such relief, Debtor may deal with the Rangers as is consistent with the other provisions of the Code and court orders. To conclude that section 1124(1) requires allowing invocation of Pledge Agreement § 4.4.1(c)(i)(3) or 4.4.2(b)(i) prior to the effective date of a plan would be tantamount to requiring, for compliance with section 1124(1), allowing enforcement by a creditor of its "legal, equitable, and contractual rights" prior to confirmation of the plan by the court and the binding effectiveness of that creditor's plan treatment.

Fifth, in the instant case, if the Lenders can utilize section 4.4.1(c)(i)(3) (or section 4.4.2(b)(i)) to block a sale, Debtor, a solvent entity, notwithstanding payment in full of all of its monetary obligations, could only confirm a plan that was acceptable to the Lenders or through cramdown by artificial impairment of another class of creditors. Given the impasse reached between the BOC and the Lenders, that would mean Debtor would have to artificially impair some class of creditors so that it satisfies the requirement for invocation of section 1129(b)(1) of the Code that one impaired class of creditors has accepted the proposed plan (Code § 1129(a)(10)). It would be inconsistent with public policy to construe the Code in a fashion that encourages debtors to deal with creditors by artificial impairment when such creditors could otherwise be left unimpaired.[36]

For the foregoing reasons, the court concludes that treatment of the Lenders, to satisfy section 1124(1), must grant them their rights under their loan documents prospectively. While payment of the $75,000,000 plus interest will satisfy and discharge Debtor's monetary obligations as required by section 1124(1),[37] in order for the Plan to be confirmed without the acceptance of the Lenders or satisfaction of Code § 1129(b)(1), the treatment of the Lenders must be modified to allow them to exercise their rights under their loan documents following the effective date.

#### 2. The Rangers Equity Owners

Debtor takes the position that, as REHLP and REHGP will retain their interests in Debtor under the Plan, they are unimpaired. Even if the Plan impairs equity, however, Debtor points to the prepetition consent by REHLP and REHGP and urges that the court conclude this amounts to acceptance of the Plan.

---

ors to waive."); *Wells Fargo Bank, N.A. v. Kobernick,* 2009 U.S. Dist. LEXIS 126723, at *20–*22 (S.D.Tex.2009); *Farm Credit of Central Fla., ACA v. Polk,* 160 B.R. 870, 872–74 (M.D.Fla.1993).

**36.** It is obviously preferable that a debtor's reorganization involve only that impairment of claims and interests which is actually needed to effect the debtor's reorganization and ensure against the need for future bankruptcy proceedings.

**37.** Other claims the Lenders may have by virtue of, *e.g.,* their fraudulent transfer claim against Debtor will be dealt with by the Plan as well.

Even if the Plan had not been modified, the court could not agree with Debtor. Under the Partnership Agreement, Debtor's governing document, sale of the Rangers is a "major decision." Partnership Agreement § 4.3(b). A major decision cannot be taken except with approval of a majority of the partners. Partnership Agreement § 4.3. Had a plan been proposed post-petition which called for sale of the Rangers, the plan would clearly have impaired the owners of Debtor's equity. As to the argument that the Rangers Equity Owners' prepetition consents satisfy the requirement of acceptance of the Plan, the requirements under the Code for counting a prepetition acceptance are different from the prerequisites for a consent under the Partnership Agreement.[38] For example, Code § 1126(b) sets disclosure requirements that must be met to count a prepetition acceptance in determining whether to confirm a plan.

 In any case, in the case at bar, even if the court assumed that the prepetition approval of the Plan by the Rangers Equity Owners satisfied the requirement of their acceptance of it, the post-petition changes to the Plan require, at a minimum, affording the Rangers Equity Owners the opportunity to change their votes, as required by Code § 1127(d). As modifications already made to the Plan provide for payment of interest to both the Lenders and other unsecured creditors, the return to equity will necessarily be reduced by the amount of that interest not previously provided for in the Plan.[39] As this change clearly "adversely change[s] the treatment [under the Plan] of ... the interest[s] of ... equity security holder[s]," the modifications to the Plan cannot be "deemed accepted" under Fed. R. Bankr.P. 3019(a). While under that rule effecting the modification, if it were accepted in writing by both REHLP and REHGP, would not require compliance with section 1127(d), such acceptance by REHGP and REHLP would be acts respecting property of their estates outside the ordinary course of business. As the court has made section 363 applicable in their cases, their acceptance of the modifications of the Plan will require court approval.

Because the Lenders and the Rangers Equity Owners are impaired, the Plan, even as modified on June 17, cannot be confirmed on the basis that no class of creditors or equity owners is impaired. Moreover, while the impairment of the Lenders may be cured without significant changes to the Plan, that of the Rangers Equity Owners cannot be avoided and they must be allowed to elect whether to accept or reject the Plan. In making that election, the Rangers Equity Owners will have to seek court approval, acting in their fiduciary capacities outside the ordinary course of business.

## IV. Conclusion

The court will not direct any changes to the Plan. However, unless the treatment of the Lenders is modified, the Plan (as modi-

---

**38.** Although the Partnership Agreement would permit approval of a sale of the Rangers by a simple majority of the partners, if the sale were to be accomplished pursuant to a plan, acceptance by the 2/3 majority required by Code § 1126(d) would be necessary. *See Lopez v. Consejo de Titulares del Condominio Carolina Court Apart. (In re Torres)*, 2007 Bankr.LEXIS 4717, 25–26 (Bankr.D.P.R. Sept. 6, 2007) ("The Bankruptcy Code with few exceptions, supersedes any law or regulation of any state or any corporate or condominium bylaw.").

**39.** As the further modifications necessary to leave the Lenders unimpaired could result in additional claims by the Lenders against Debtor, incorporating those modifications in the Plan would also require giving the Rangers Equity Owners at least the opportunity to accept or reject the Plan as modified.

fied to date) will not be confirmable absent acceptance by the Lenders, the only class of creditors that is impaired under the present iteration of the Plan. *See* Code § 1129(a)(10). If the Plan is modified to conform the Lenders' treatment to Code § 1124(1), as construed in this memorandum opinion, the Plan will be confirmable if it meets the other requirements of section 1129(a) and is accepted in its modified form by the Rangers Equity Owners.

The court will defer entry of an order formalizing the rulings in this memorandum opinion. The findings and conclusions in this memorandum opinion will be incorporated in any order confirming or denying confirmation of the Plan (including any modified version of the Plan).